**TYLER HOUSE APARTMENTS,
LTD., et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 95–354C.

United States Court of Federal Claims.

May 12, 1997.

Eric M. Drattell, McDermott, Will & Emery, Washington, D.C., for plaintiffs. Jon W. van Horne and Laura E. Rolander, of counsel.

Harold D. Lester, Jr., with whom were Frank W. Hunger, Assistant Attorney General and David M. Cohen, Director, Civil Division, Department of Justice, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

This is an action for an alleged breach of contract, or, in the alternative, an uncompensated taking under the Fifth Amendment to the United States Constitution. The eight plaintiffs all have, or had, some connection with, or interest in, an apartment building known as Tyler House, in Washington, D.C. The matter is pending on the Government's motion to dismiss or, in the alternative, for summary judgment. After considering the parties' written and oral argument, the court agrees with defendant that, on the uncontested facts, as a matter of law there can be no liability.

### Background [1]

Tyler House Apartments, located at 1200 North Capitol Street in Washington, D.C., is an eight story apartment building. Mt. Airy Baptist Church built it in 1971, in part using loan proceeds guaranteed by the Department of Housing and Urban Development (HUD), pursuant to section 236 of the National Housing Act, 12 U.S.C. § 1715z–1(c). The church

---

1. The facts are drawn from the complaint, the uncontested proposed findings of fact, and from documents attached to the parties' submissions.

entered into a contract with HUD known as a Regulatory Agreement.

Over time, the building became what plaintiff characterizes as a "financially and physically troubled" property. HUD requested National Investment Development Corporation (NIDC) to put together an investment group to take over the building. NIDC agreed and formed a wholly-owned subsidiary, Partnership Investor Services, Inc. (PISI), one of the plaintiffs. PISI formed a limited partnership with another plaintiff, Housing Investment Fund II, Ltd. (HIF), a California limited partnership. Together they formed Tyler House Apartments, Ltd. (THAL), a District of Columbia limited partnership, also one of the plaintiffs. PISI was the general corporate partner, and HIF was the limited partner.

Transfer of ownership from the church to THAL was accomplished, in part, by HUD's necessary approval of a document known as a "Transfer of Physical Assets," or TPA. Final approval and sale were consummated in 1978. THAL re-executed the Regulatory Agreement with HUD and executed a Housing Assistance Payment Contract (HAP).

Life was apparently no better to Tyler House after the transfer than before. The complaint and other materials chronicle a depressing history of drugs, violence, inadequate maintenance and general physical deterioration. The plaintiffs attribute these problems in part to HUD. It is alleged that the agency "unconscionably and consistently delayed responding to and failed to approve requested and meritorious rent increases, or to permit justifiable additional Section 8 assistance to needy tenants at Tyler House." Complaint ¶ 36. Plaintiffs' references are to potential financial assistance that HUD is statutorily able to give owners or renters of subsidized or federally–insured housing.

Faced with this situation, NIDC formed another limited partnership in the District of Columbia, Tyler House Apartments, Ltd. I (THAL–I), in hopes of attracting additional private capital through sale of the property by THAL to THAL–I. PISI also served as the corporate general partner of THAL–I. AFC Capital Fund I, a California limited partnership, was the limited partner in THAL–I. Both AFC Capital Fund I and THAL–I are named as plaintiffs in this action. THAL entered into an agreement to sell Tyler House to THAL–I in May, 1983. A TPA was submitted to HUD in August, 1983, although it was never approved.

By 1986, NIDC—the parent company of PISI and the general partner in THAL—was experiencing financial problems. In order to "avoid wholesale default on a large number of insured mortgages," Compl. ¶ 38, Associated Financial Corporation (AFC), which, although it appears to be connected to AFC Capital Fund, has not heretofore appeared in the narrative, and its principals, A. Bruce Rozet and Deane Ross, acted to acquire NIDC. This was done through Management Assistance Group, Inc. (MAGI), an affiliate of AFC, purchasing all the stock of NIDC. MAGI thus became the owner of PISI, which was the corporate general partner in both THAL and THAL–I. To summarize the effects of these proliferating acronyms, Rozet, Ross, and AFC owned MAGI, which in turn owned NIDC, which in turn owned PISI, which in turn was a general partner in THAL and THAL–I, one of which owned Tyler House apartments. All of these individuals or entities, except for AFC, are plaintiffs here, along with HIF, the limited partner in THAL.

Plaintiffs allege that, prior to MAGI's purchase of NIDC stock, "Government officials involved in such purchase expressed an understanding and willingness to work with the purchasers regarding the physical and financial needs of the projects involved, including Tyler House. . . . At all times, HUD officials were aware of plaintiffs' actions and encouraged plaintiffs to continue to study the properties' problems and make proposals for corrective actions." Compl. ¶ 38. They also allege that "MAGI properly assumed ownership of NIDC and responsibilities with respect to Tyler House, in reliance on HUD's good faith in administration of its programs and based on HUD's responsibility to participate in rehabilitation of Tyler House." Id. at 41.

In 1987, the tenants commenced a series of lawsuits against several of the plaintiffs

named here, seeking to have the court force them to provide safe and sanitary housing. In an effort to respond to the complaints, THAL–I invested approximately $600,000 between 1987 and 1989 to rehabilitate Tyler House.

Also in 1987, THAL–I submitted another in a series of requests for rent increases to HUD, which had to approve such increases. This request was only allowed in part. Plaintiffs contend that the agency's refusal to grant the entire request was unlawful. Meanwhile, the agency was still withholding consent to the TPA, which would have made THAL–I the legal owner of the property.

One of the causes for holdup on approval was the existence of a lien on the property filed by the general contractor, Majestic. The 1977 lien secured a judgment Majestic had obtained against Mt. Airy. According to plaintiffs, the existence of the lien was a violation of a HUD–approved construction contract between Mt. Airy and Majestic. Plaintiffs also allege that the lender, the Federal National Mortgage Association (Fannie Mae) was aware of the lien at the time of the transfer to THAL. Plaintiffs contend that HUD's refusal to approve the TPA, grounded in part on the existence of the lien, was "arbitrary and capricious."

As part of negotiations with the tenants, plaintiffs conducted a survey of the physical problems with Tyler House. One of the more serious problems uncovered was the presence of asbestos. Removal would be very expensive. Plaintiffs estimated at that time that a complete rehabilitation would cost $18 million. As part of their negotiations with HUD for more federal financing, plaintiffs offered to obtain $2 million in private capital. HUD rejected the plaintiffs' initial proposals in September, 1988, and suggested plaintiffs put together a less costly alternative.

Plaintiffs allege that HUD officials were well aware of the problem of asbestos at Tyler House and in federally-subsidized housing elsewhere, but that the officials deliberately "covered up the existence of any study of the implications" in the hopes that owners would absorb that potential liability. Compl. ¶ 53. Plaintiffs contend that, despite this knowledge, HUD officials encouraged MAGI to purchase NIDC.

Unfortunately, problems with Tyler House continued to proliferate as fast as acronyms. In February, 1989, plaintiffs offered to deed the property to a tenant co-op along with a $200,000 contribution. Apparently the tenants thought better of that offer because THAL remained as owner.

According to the complaint, in 1989 HUD adopted a new policy of not "working cooperatively with and providing . . . housing owners assistance to correct physical problems with individual housing projects." Compl. ¶ 56. The only evidence offered of this change in policy is HUD's rejection of plaintiffs' "sophisticated" re-financing plan involving additional private capital, assistance from the government of the District of Columbia and assistance from HUD. The nature of this plan, as well as HUD's reaction to it are apparent from a May 26, 1989 letter from Donald Spiegelman, Special Counsel to AFC, to Margaret White, "Manager" of HUD. The letter describes a meeting held on May 22, 1989, at which plaintiffs communicated that Tyler House could not "survive without massive government subsidy." At the meeting, HUD "indicated its inability to provide that level of subsidy, even if it meant bankruptcy of the mortgagor, followed by assignment of the HUD-insured mortgage." HUD was advised that the bankruptcy "process commenced today with the filing of a bankruptcy petition of [THAL]."

According to Spiegelman's letter, the plan AFC had proposed earlier

> contemplated a $2,000,000 equity contribution which AFC could obtain by marketing tax credits; a tax-exempt bond issue with the cooperation of the District of Columbia, assuring, a favorable rate on the new financing; and some assistance with real estate taxes and utilities from the District. On the other hand, it needs flexible subsidy, Section 8 increases and insurance of a more than $10,000,000 second mortgage under Section 241.

HUD was able to pass up this attractive offer. Perhaps it was because the "equity" AFC was furnishing was not its own cash,

but monies that might be derived from the sale of tax credits. Perhaps it was because the deal was contingent on the District of Columbia floating a tax exempt bond issue and waiving $2.25 million in real estate taxes and utility charges. Perhaps it was because the plan required what Spiegelman characterized as the "substantial assistance" and "massive aid" of HUD. In any event, the letter makes plain that the plan was not subject to negotiation: "[N]o lesser plan would provide meaningful solutions."[2] Plaintiffs contend that HUD's failure in May, 1989, to participate in this plan was "summary" and "illegal."

THAL did in fact go into chapter seven bankruptcy in California on June 6, 1989. PISI also went into bankruptcy on the same date. THAL–I preceded them by one week. In the schedule of liabilities it filed, THAL–I listed HUD as having a valid claim as a secured creditor for $755,000. In addition, it identified a mortgage on the property held by Fannie Mae for the amount of $5,651,700. On the asset side, none of the asset statements for these three bankrupts showed a claim against HUD. THAL was discharged of all debts on March 7, 1991. PISI was discharged on June 28, 1990. The THAL–I bankruptcy remains open.

On June 6, 1989, the trustee in bankruptcy for THAL–I moved to abandon Tyler House as an asset, or for an order compelling HUD and Fannie Mae, as secured creditors, to pay for the cost of preserving and maintaining Tyler House and correcting violations of health and safety regulations. On August 2, 1989, Fannie Mae elected to assign its mortgage to HUD on payment by HUD of the outstanding balance. On August 4, 1989, the trustee and other parties signed a stipulation granting HUD "Mortgagee in Possession" status. HUD took over the building. The trustee in effect ordered that HUD receive all assets listed in THAL's schedule of assets, consisting of cash, minor personalty,

and the building. In exchange, HUD gave up its right to enforce its $755,000 secured claim and the $5.6 million mortgage on the property.

This suit was brought on May 19, 1995. It is alleged that the May 22, 1989 refusal by HUD to accept plaintiffs' financing plan was a breach of contract or that it constituted a taking of their contract rights without the compensation required by the Fifth Amendment. It is also alleged in briefing that a physical taking occurred in August 1989, when HUD took over Tyler House.

On January 16, 1996, after this suit had commenced, the trustee in the THAL–I bankruptcy, at MAGI's request, moved the bankruptcy court for approval of a sale to MAGI of all THAL–I's right, title, and interest in the present cause of action. The Government vigorously, and vainly, protested the sale. Despite the fact that neither THAL nor THAL–I listed the causes of action embraced in this lawsuit as assets, and despite the fact that HUD previously had theoretically been granted all of THAL–I's then-known assets, the court on June 17, 1996, granted the motion and, for $30,000, MAGI assumed whatever rights THAL–I has in this action.

### Discussion

Much of the complaint must be ignored as plainly beyond the jurisdiction of the court. Allegations of racial genocide, slander, fraud in the inducement, and harassment come to mind. The question is whether, in all the hyperbole, there is an actionable claim that can be brought by one or more of the eight plaintiffs. The court is satisfied that there is none.

THAL–I, PISI, AFC Capital Fund II, HIF, A. Bruce Rozet, and Deane Earl Ross should never have appeared in this suit. Plaintiffs' most recent briefing concedes as much.[3] They will agree to the dismissal with

---

2. HUD apparently took this ultimatum seriously, as the complaint alleges that HUD "arbitrarily and capriciously made no counteroffer." Compl. ¶ 68.

3. If these plaintiffs were not willing to leave, they would be dismissed involuntarily. THAL was the

only plaintiff that had a contractual relationship with the Government. Having no contractual relationship with the Government, these plaintiffs attempt to proceed on a taking theory. To allege a taking, however, one must have property. None of these other entities owned either

prejudice of all parties other than MAGI and THAL. At oral argument, it was also conceded that THAL and MAGI had no cause of action to enforce when the complaint was filed, and that THAL still has no enforceable cause of action. Plaintiffs nevertheless ask that THAL be retained in the suit, or only dismissed without prejudice, to permit MAGI to purchase from the trustee in THAL's closed bankruptcy whatever cause of action THAL had at the time the bankruptcy was filed. As to MAGI, special arguments are raised that will be dealt with below.

■ When a debtor files for bankruptcy, it files a list of assets, 11 U.S.C. § 521(1), to consist of "legal or equitable interests ... in property as of the commencement of the case." The property interests that must be listed include any causes of action the debtor may have at the time it files a petition. *See In re Geise,* 992 F.2d 651, 655 (7th Cir.1993). These become the property of the bankruptcy estate. 11 U.S.C. § 541(a)(1). At that point, the power to assert such a claim rests solely with the bankruptcy trustee. *Bauer v. Commerce Union Bank,* 859 F.2d 438, 441 (6th Cir.1988), cert. denied 489 U.S. 1079, 109 S.Ct. 1531, 103 L.Ed.2d 836 (1989); *see* 11 U.S.C. § 323(a).

■ At the close of the bankruptcy proceeding, any assets, including claims, that were scheduled by the debtor but not disposed of are deemed abandoned and revert to the debtor. 11 U.S.C. § 554(c). Unscheduled claims, however, such as those at issue here, remain the property of the estate, i.e., under the trustee's control. *See Vreugdenhill v. Navistar Int'l Transp. Corp.,* 950 F.2d 524 (8th Cir.1991).

The net effect of this hornbook law is that, upon the bankruptcy filings by THAL, THAL-I, and PISI, and forever thereafter, the trustees were the only entities that had a right to assert a cause of action that these debtors may have had. The situation has not changed to this date with respect to PISI and THAL.

■ The issue is one of standing. "If a cause of action belongs to the estate, then the trustee has exclusive standing to assert the claim." *In re Educators Group Health Trust,* 25 F.3d 1281, 1284 (5th Cir.1994). *See also Cain v. Hyatt,* 101 B.R. 440, 442 (E.D.Pa.1989) ("[A]fter appointment of a trustee, a Chapter 7 debtor no longer has standing to pursue a cause of action that existed at the time the Chapter 7 petition was filed. Only the trustee, as representative of the estate, has the authority to prosecute and/or settle such causes of action.")

■ The only entity in any contractual privity with HUD was THAL. Any rights it had arising out of that contract were transferred long ago to the trustee in bankruptcy, however. This means that, when the complaint was filed in May 1995, THAL had no standing to assert its "claim." Standing rested exclusively with the trustee. Preserving THAL as a party, therefore, would be improper. The only purpose of keeping it in the suit would be to avoid the lapse of the limitations period as to a claim MAGI is contemplating purchasing from the closed THAL estate. That purpose is not one that the court will countenance for reasons set out below in connection with MAGI's purchase of the THAL-I claim. In short, THAL should be dismissed for lack of standing.

■ The only party left, therefore, is MAGI. But since MAGI's only useful interest, if any, is what it bought from the THAL-I bankruptcy trustee, the real question is whether the trustee sold it a pig in a poke sack. He did.

MAGI concedes that, in its own capacity, it had no cause of action as of May 1995, when the complaint was filed. In its initial brief in opposition to dismissal for lack of standing, MAGI concedes that it was not in contractual relationship with HUD. The HAP contract and the Regulatory Agreement were between THAL and HUD. It was not the nominal or equitable owner of Tyler House, and, thus, also could not assert a taking claim at that point. If it has any cause of action, it acquired it from the trustee in June 1996, several months after the running of the limitations period. Plaintiffs contend that the contract arose on May 22, 1989, when HUD

Tyler House or the contract that was allegedly taken.

rejected the re-financing plan. The taking claim arose, they contend, in August 1989, when the foreclosure took place.

MAGI argues, however, that the THAL–I bankruptcy estate did have a cause of action for either a taking or a breach of contract as of May 1995. MAGI then bought that cause of action in June 1996. Although the purchase was made after the running of the limitations period, it contends that MAGI's rights relate back to THAL–I's original timely filing in May 1995. In effect, it contends, the trustee was the real party in interest at the time of the filing of the suit, as heir to an unlisted cause of action owned by THAL–I, and that he could have been substituted under RCFC 17. Because the trustee could have been substituted as the real party in interest, MAGI, as purchaser of the trustee's cause of action, should be deemed substituted, and its claim should relate back to the original filing date May 1995.

What MAGI proposes, however, is nothing short of alchemy. A party that did not have a cause of action at any point before expiration of the limitations period (MAGI), buys a cause of action after the expiration of the limitations period from the trustee, who has not been a party to the proceeding before or after the limitations period. Combining that with the fact that a party who did not have a right to bring that cause of action (THAL–I) brought a meritless claim a few days prior to the running of the limitations period, MAGI's claim is not stale. Or so it is argued.

■ This neat little solution has some serious problems. Assuming, for the moment, that THAL–I had some contract or property right sufficient to support a cause of action, MAGI's claim is untimely under either of two analyses. First, as defendant correctly points out, jurisdiction is determined at the time the complaint is filed. *Sharman Co. v. United States*, 2 F.3d 1564, 1569 (Fed.Cir. 1993) *overruled in part by, Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed.Cir.1995). Defendant correctly explains that post-filing, events cannot create jurisdiction, citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 571 n. 4, 112 S.Ct. 2130, 2142 n. 4, 119 L.Ed.2d 351 (1992). At that point, THAL–I and MAGI had no standing to bring this action, as explained above. As the Supreme Court has repeatedly held, standing represents a jurisdictional requirement. *See, National Organization for Women Inc. v. Scheidler*, 510 U.S. 249, 255, 114 S.Ct. 798, 802–03, 127 L.Ed.2d 99 (1994); *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 607–08, 107 L.Ed.2d 603 (1990); *Bender v. Williamsport Area School District*, 475 U.S. 534, 547, 106 S.Ct. 1326, 1334, 89 L.Ed.2d 501 (1986). What the Court is concerned with is that there be a party with a redressable injury, to preserve the need for a case or controversy. *See Morrison v. Olson*, 487 U.S. 654, 670, 108 S.Ct. 2597, 2608, 101 L.Ed.2d 569 (1988); *Bender*, 475 U.S. at 546, 106 S.Ct. at 1333–34. In the present case, in other words, no entity with standing brought a timely action in this court. Thus, as of May 1995, the court had no jurisdiction. The lack of standing, a jurisdictional defect, therefore cannot be cured *nunc pro tunc* back to the date when the original complaint was filed.[4]

---

4. The Federal Circuit's opinion in *GAIA Techs. v. Reconversion Techs.*, 93 F.3d 774 (Fed.Cir.1996) is instructive. There the court held that an alleged owner of patents and trademark did not have standing to sue because it could not prove that it owned the intellectual property at the time the suit was filed. *GAIA*, 93 F.3d at 778, 780. Although there was a suggestion in the facts that GAIA actually owned the property after the filing of the complaint, the only period important to GAIA's standing was when the complaint was filed. As the court stated:

As a general matter, parties should possess rights before seeking to have them vindicated in court. Allowing subsequent assignment to automatically cure a standing defect would unjustifiably expand the number of people who are statutorily authorized to sue. Parties could justify the premature initiation of an action by averring to the court that their standing through assignment is imminent. Permitting non-owners and licensees the right to sue, so long as they eventually obtain the rights they seek to have redressed, would enmesh the judiciary in abstract disputes, risk multiple litigation, and provide incentives for parties to obtain assignments in order to expand their arsenal and the scope of litigation. Inevitably, delay and expense would be the order of the day.

*Id.* at 780 (quoting *Procter & Gamble Co. v. Paragon Trade Brands, Inc.*, 917 F.Supp. 305, 310, 38 USPQ2d 1678, 1682 (D.Del.1995)).

Nor should MAGI be able to argue that it could be substituted in as the current real party in interest to take advantage of the liberal relation back policy of Rule 17. *United States v. CMA, Inc.* 890 F.2d 1070 (9th Cir.1989), is squarely on point. There the court was faced with whether to revive stale claims by judgment creditors of a Miller Act subcontractor against the contractor under either Rule 15 or Rule 17. The court, in dealing with the latter rule, noted that it contemplates that the substitution "shall have the same effect as if the action had been commenced in the name of the real party in interest." *CMA,* 890 F.2d at 1074. It then held as follows in rejecting relation back:

> The purpose of this portion of Rule 17(a) is to prevent forfeiture of an action when determination of the right party to sue is difficult or when an understandable mistake has been made.
>
> . . . .
>
> ... Rule 17(a) does not apply to a situation where a party with no cause of action files a lawsuit to toll the statute of limitations and later obtains a cause of action through assignment. Rule 17(a) is the codification of the salutary principle that an action should not be forfeited because of an honest mistake; it is not a provision to be distorted by parties to circumvent the limitations period.

*Id.* at 1074–75. This view of the rule is supported by 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Fed. Prac. & Proc.* 1555, p. 415.

Here the failure to proceed through the trustee cannot be viewed as an honest mistake. THAL–I was still in bankruptcy in May 1995. Even if it were not, the fact that the trustee had the right of action should have been well known to experienced counsel. Further, Wright and Miller suggest that relation back be allowed when "necessary to avoid an injustice." *Id.* Here, the opposite would result if relation back were allowed. THAL–I did not list a claim against HUD among its assets, despite the fact that all the events necessary to the contract claim had already taken place. With that understanding, HUD agreed to take over the liabilities of THAL–I and in exchange received the obligations attendant upon owning Tyler House.

Under virtually identical circumstances, the court in *Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414 (3d Cir.), *cert. denied,* 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988), held that the subsequent claim was barred. The situation is close enough to the present facts to warrant a lengthy quotation from that decision:

> It has been specifically held that a debtor must disclose any litigation likely to arise in a non-bankruptcy contest. The result of a failure to disclose such claims triggers application of the doctrine of equitable estoppel, operating against a subsequent attempt to prosecute the actions.
>
> . . . .
>
> Disclosure is important, in this case, not only to the bank as an adversary and as a creditor, but to the other creditors and to the bankruptcy court. Here, "the silence" in the Oneida bankruptcy record concerning this present claim, as they say in the vernacular, "is deafening." In Schedule A–2 of its Statement of Financial Affairs required by § 521, Oneida acknowledged its debt to the bank in an amount of approximately 7.7 million dollars, without any mention of a setoff. The debt to the bank in part represented principal and interest due on the lending agreements, the alleged breach of which Oneida now seeks to place at issue.
>
> . . . .
>
> We can assume that revealing the potential action may also have impacted upon the bank's decision to enter into the stipulation establishing the extent and validity of its lien against Oneida and to vote for confirmation.... In such circumstances, employment of equitable estoppel is required to preserve the integrity of the earlier proceedings....
>
> . . . .
>
> In order to preserve the requisite reliability of disclosure statements and to provide assurances to creditors regarding the finality of plans which they have voted to approve, we hold that under the facts here present Oneida's failure to announce this

claim against a creditor precludes it from litigating the cause of action at this time. *Oneida,* 848 F.2d at 417–18. *See Payless Wholesale Distribs., Inc. v. Alberto Culver (P.R.), Inc.,* 989 F.2d 570, 571 (1st Cir.), *cert. denied,* 510 U.S. 931, 114 S.Ct. 344, 126 L.Ed.2d 309 (1993) (applying comparable reasoning under rubric of judicial estoppel).

For similar reasons, the court holds here that it would be a gross injustice to permit MAGI to resurrect a claim which, if it existed at all, should have been asserted before the stipulation was entered into by all parties, including THAL–I and the trustee.[5] The court declines, therefore, to treat the events surrounding sale to MAGI of the trustee's rights to whatever cause of action THAL–I may have had as relating back to the time of the filing of the complaint. The fundamental jurisdictional problem therefore remains: no entity with standing brought a timely complaint. For this reason alone, MAGI should be dismissed.

■ It would be small consolation to MAGI if it lingered, however. Although MAGI contends that THAL–I could have maintained this action on behalf of its general and limited partners under District of Columbia law, THAL–I had nothing to bequeath the trustee. THAL–I, the entity from which the trustee, and thus MAGI, inherited its claim, was not in a contractual relationship with the Government. The transfer to THAL–I had never been approved, and consequently THAL–I and HUD had not re-executed new contracts. Even if it was in "equitable" privity with HUD, counsel conceded at oral argument that HUD's only express contractual obligation was to insure the loan. The agency met that obligation, to its own injury. It had no further obligation to THAL–I or any other party to continue its investment in this property. Plaintiffs had no contractual right to speculative government assistance and subsidies. The assertion of an amorphous obligation to "work with plaintiffs" to provide financial assistance to avoid breach of an obligation of good faith and fair dealing was also satisfied. The record makes clear that HUD officials met many times with representatives of plaintiffs and considered their proposals. They had no obligation to do more than that. HUD was not a guarantor of THAL's financial success, and, as counsel conceded, the primary obligation to address the need for eliminating the asbestos was with THAL. HUD's regulatory duties in connection with overseeing the various statutory assistances it can lend are not contractual in nature. The Regulatory Agreement merely cited HUD's regulations. This general acknowledgment did not incorporate specific duties by reference.[6] If THAL had a problem with decisions HUD was making in its administrative capacity, it should have pursued an action in district court under the Administrative Procedure Act. 5 U.S.C. § 701 et seq. (1994).

■ Clutching for a last straw, MAGI argues that THAL–I's property was taken by HUD's conduct. This claim is disclosed in Count IV of the complaint, where it is recited that

Plaintiffs' contracts provided Plaintiffs property rights in the receipt of the cooperation and assistance contemplated and necessary to provide the contracted low income housing. HUD's unreasonable and unlawful refusals to cooperate and provide a fair opportunity for Plaintiffs' participation in its various housing subsidy and assistance programs caused the subsequent financial difficulties which led to

---

5. Contrary to plaintiffs' assertions, the trustee and bankruptcy court did not address or preclude this argument by the Government. The sale was specifically conditioned on preservation of all of the Government's rights and defenses here.

6. Plaintiffs make much of the fact that the HAP contract contains the following section:

This contract and its exhibits comprise the entire agreement between the parties to this Contract with respect to the matters contained in it. Neither party is bound by any representations or agreements of any kind except contained in this Contract, in any applicable regulations, in HUD's administrative procedures, or in agreements entered into in writing (e.g. the project Regulatory Agreement).

They contend that this provision brings into the contract, and makes contractually enforceable, all HUD regulations applicable to assisted housing. This language does no more than state the obvious: HUD is bound by its own regulations.

foreclosure on the mortgage and loss of the property.... HUD's unreasonable failure to make the requested assistance and subsidies available in a timely manner reduced the returns that should have been made to all who had an interest in Tyler House. This lack of assistance and subsidy constitutes a taking of plaintiffs' property for public use and require just compensation under the Fifth Amendment of the U.S. Constitution.

Compl. ¶¶ 112–13. It is difficult to know where to begin grappling with this moonshine. The most logical place, perhaps, is to observe that, to the extent this assertion is posited on a contract, THAL–I concedes it had no contract with the Government.

■ For similar reasons, no taking claim could have existed. HUD could not take from THAL–I what it never had, and it did not have a contract with the Government. Even if there were a contract imbedded somewhere in THAL–I's claim, moreover, plaintiffs' briefing correctly anticipates the complete answer: taking claims cannot be founded on the mere allegation of a breach of contract. If a contract was breached, the remedy is contractual.[7]

In its briefing, MAGI adds somewhat to the taking allegation. It hints that HUD's taking of title to the property effected the "permanent, physical occupation" of Tyler House, citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). Presumably THAL–I takes the position that, because it entered into a sales agreement with THAL for taking over Tyler House, it had a legal or equitable ownership interest in the building.

■ At some point, plaintiffs' promiscuous legal posturing must come to an end. In the bankruptcy of THAL–I, the assets of the bankrupt, including whatever interest it had in the building itself, passed into the trustee's hands. From that point on, THAL–I did not own the building. The trustee then approved HUD's takeover of the building and subsequent foreclosure on the mortgage securing it. HUD now became legal owner of that building, *after* THAL–I had already lost whatever interests it had to the trustee. Because of that stipulation, the mortgage to Fannie Mae, assumed by HUD, was extinguished. THAL–I participated as a willing partner in that takeover. For it now to take the position, through MAGI, that HUD owes it compensation for the building is nothing short of outrageous. If HUD's takeover under a voluntary bankruptcy decree could somehow be warped into an actionable taking, it was the trustee's property that was taken, not THAL–I's. Moreover, as defendant correctly contends, THAL–I, and hence MAGI, are estopped from contending that they are owed anything from that series of events.

### Conclusion

Defendant's motion for summary judgment is granted. The court does not have jurisdiction over this complaint because no action was timely commenced by a party with standing. If MAGI's claim could be deemed timely, it would, in any event, have to be dismissed because, on the uncontested facts, defendant is entitled to summary judgment. The clerk is directed to dismiss the complaint. Costs to the defendant.

---

**7.** *See J.J. Henry Co. v. United States*, 188 Ct. Cl. 39, 46, 411 F.2d 1246, 1249 (1969); *Marathon*

*Oil Co. v. United States*, 16 Cl.Ct. 332, 338–39 (1989)