**DONINGER METAL PRODUCTS, CORP., Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 97–137C.

United States Court of Federal Claims.

July 31, 2001.

James K. Stewart, Washington, D.C., attorney of record for the plaintiff.

Wanda Rubianes–Collazo, Commercial Litigation Branch, Civil Division, Deborah A. Bynum, Assistant Director, David M. Cohen, Director, Department of Justice, Washington, D.C., for the defendant.

## OPINION

HORN, Judge.

## FINDINGS OF FACT

In 1992, the United States Postal Service (USPS) issued a solicitation for the production and delivery of three different types of Postal Service lockboxes. The parties have defined lockboxes as "mail receptacles with locks commonly housed in post offices and available to Postal Service customers for a fee." The units requested in the solicitation were lockboxes commonly referred to as 2901's (12 boxes per unit), 2903's (4 boxes per unit), and 2904's (2 boxes per unit). As originally issued, the solicitation included a delivery schedule to Postal Service Material Distribution Centers in Sommerville, New Jersey, Norcross, Georgia, Topeka, Kansas, and Buena Park, California. The original delivery schedule required deliveries starting on September 24, 1992 and concluding on September 23, 1994.

The solicitation required offerors to submit a firm fixed price offer based upon FOB origin and FOB destination delivery requirements. On August 26, 1992, the USPS awarded the contract for 2901's, 2903's, and 2904's to Doninger Metal Products Corporation (Doninger) through contract number 059990–92–B–0804. Doninger was awarded the contract in the amount of $5,419,653.12.

Section H.2 of the contract between the parties, entitled "Changes," states:

a. The contracting officer may, in writing, without notice to any sureties, order changes within the general scope of this contract in the following:

1. Drawings, designs, or specifications when supplies to be furnished will be specially manufactured for the Postal Service in accordance with them.

2. Statement of work or description of services.

3. Method of shipment or packing.

4. Place of delivery of supplies or performance of services.

5. Delivery or performance schedule.

6. Postal Service-furnished property or facilities.

. . . .

c. If any such change affects the cost of performance or the delivery schedule, the contract will be modified to effect an equitable adjustment.

At the time of the award, Doninger was located in Freeport, New York. When the contract was awarded, the USPS included delivery requirements which were revised from the solicitation and incorporated into the contract. These revisions delayed the delivery schedule and restricted delivery to two locations: the Sommerville, New York and Topeka, Kansas Material Distribution Centers. The revised delivery schedule required deliveries of 2901's from October 16, 1992 until August 19, 1994, 2903's from April 2, 1993 until February 3, 1995, and 2904's from October 16, 1992 until January 6, 1995, extending the date of the last delivery by 133 days.

A post-award conference was held on September 15, 1992 to discuss several matters, including the impact of the revised delivery schedule. The contract terms apparently were not changed as a result of this conference, and performance on the contract appears to have begun according to the revised delivery schedule. During the performance period, by letter dated January 25, 1993, Doninger submitted its first "claim for equitable adjustment," requesting $477,573.09 for its anticipated total increase in costs due to

the changes impacting delivery of the 2901 and 2903 components. Subsequently, on May 27, 1993, Doninger submitted a second claim in the amount of $196,308.45 on behalf of Doninger's subcontractor, Al's Tools & Dies, for the 2904 components.[1] On March 22, 1993, as an interim measure, pending receipt of a cost analysis conducted by the USPS, the parties agreed to execute bilateral modification 02 (Modification 02), which would temporarily adjust the price of the contract items so that the prices for 2901's and 2903's were increased by four dollars per unit, increasing the total contract price to $5,788,755.52. Between January and March 1993, Doninger moved its operations from Freeport, New York to Youngsville, North Carolina.

The Contracting Officer forwarded Doninger's first "claim for equitable adjustment" to the USPS Cost and Pricing Division (Cost and Pricing Division), requesting that a cost analysis be performed. The Cost and Pricing Division ordered the Defense Logistics Agency (DLA) and the USPS Inspection Service to perform two separate audits. On November 17, 1993, after considering both audits and completing a cost analysis, the USPS issued Modification 05, which rescinded Modification 02 and decreased the total price of the contract to $5,511,233.00, allowing only $36,409.96 of the $477,573.09 requested by Doninger. On November 18, 1993 and January 11, 1994, Doninger requested clarification of Modification 05 and the reasons behind the denial of portions of its claim for equitable adjustment.

On January 19, 1994, the Contracting Officer responded with a letter detailing the rationale behind the decisions on each item of Doninger's claim. In this letter, the Contracting Officer explained:

According to USPS review, much of your proposal was found to be unsupported due to a lack of any auditable source dat[a] (i.e., departmental job costs, production operations sheets, historical costs, etc.). Therefore, much of the costs although theoretically sound, could not be audited or substantiated. For example, the 1.43

hours initially estimated to assemble a 2901 series box could not be demonstrated from the original estimating sheets. The auditor/analyst who represented the USPS received subsequent detail showing these hours to really be 1.16 per unit. When you were asked how the 1.43 hours was developed, you indicated that it had always been the standard for the 2901, yet you could not explain how the "standard" was developed, nor could you provide any comparison to actual hours incurred from your prior production contracts. These types of records are apparently not maintained by your firm.

On February 18, 1994 and February 24, 1994, Doninger submitted additional information in support of its request for an equitable adjustment and reduced its claim from $477,573.09 to $205,834.49. The Cost and Pricing Division reviewed the additional information and the revised claim submitted by Doninger. On June 30, 1994, during the performance of the contract at issue, the USPS responded to Doninger's February 18, 1994 letter and informed Doninger that because of Doninger's failure to comply with the revised delivery schedule, it found that only $26,296.30 of Doninger's claim could be justified, instead of the original $36,409.96 that had been approved pursuant to Modification 05. In the same letter, the USPS also notified Doninger that because the USPS had already paid $205,824.00 to Doninger in temporary price adjustments, Doninger owed the USPS $125,847.78, after crediting the amounts approved for both Doninger and its subcontractor. On August 1, 1994 and September 2, 1994, Modifications 07 and 08, respectively, effected administrative modifications not at issue in this case, and adjusted the contract price to $5,625,476.88.

On August 24, 1994, the parties met to discuss issues including the delays and the chemical finishing step of the manufacturing process. By letter dated September 20, 1994, the Contracting Officer represented that the USPS would not pursue the alleged overpayment to Doninger until Doninger had an opportunity to respond to the USPS's

---

1. The contract for the 2904's was terminated for default on June 1, 1995. The portion of the contract related to the 2904's is not at issue in this case.

June 30, 1994 letter. The September 20, 1994 letter stated that "[a] response must be received by the Contracting Officer no later than 11/25/94." After negotiation between the parties resulting from the August 24, 1994 meeting, they executed bilateral Modification 09 on October 3, 1994, which included an agreed to revised delivery schedule of previously segregated 2901's and 2903's and increased the total price of the contract by $121,088.00, from $5,625,476.88 to $5,746,564.88. By November 25, 1994, the USPS had not received any communication from Doninger.

On December 1, 1994, the Contracting Officer issued a final decision on Doninger's equitable adjustment claim, stating that "Doninger owes the amount of $125,847.78 to the Postal Service because of overpayments to Doninger under the contract." The final decision resulted in offsets of 25% of each invoice submitted by Doninger beginning on December 30, 1994 and ending on April 24, 1995. On May 31, 1995, Doninger submitted a certified claim for equitable adjustment relating to the revised delivery schedule for the 2901 and 2903 units, which included summary tables supporting its request for $575,377.00 for amounts actually incurred because of increased labor, materials and freight costs, and overhead and production inefficiencies. As noted above, Doninger does not seek any adjustments regarding the 2904 units in this case.

The Contracting Officer forwarded Doninger's certified claim to the Cost and Pricing Division on June 14, 1995. The Cost and Pricing Division ordered two additional audits. One was performed by the Defense Logistics Agency, Defense Contract Management Area Operations, which issued a report dated August 29, 1995. The second audit was performed by the USPS Inspection Service and resulted in a report dated September 18, 1995. The Cost and Pricing Division sent its recommendations to the Contracting Officer on October 16, 1995 and a slight revision to its recommendations on October 19, 1995. After considering the two audit reports, the Cost and Pricing Division recommendations, and the recommendations of a consultant retained by the Contracting Officer, the Contracting Officer issued her final decision on the certified claim on March 5, 1996. The final decision granted Doninger $104,372.00 of the $575,377.00 requested. However, this amount was reduced by the prior payment to the plaintiff of $26,296.30, and offset by $3,990.00 because of an overpayment on the 2904 portion of the contract.[2] The remaining $74,085.70 was paid to Doninger.

On June 9, 1995, Doninger filed a voluntary bankruptcy petition under Chapter XI of the Bankruptcy Code in the United States Bankruptcy Court, Eastern District of North Carolina, Raleigh Division. Doninger continued to represent the estate as the debtor in possession.[3] On March 1, 1996, the Doninger Metal Corporation Plan of Reorganization (Plan), as modified prior to confirmation, was approved by the United States Bankruptcy Court. The approved Plan allocated the proceeds of Doninger's certified claim to its unsecured creditors who could elect to share the money awarded by the Contracting Officer or fund litigation against the USPS. The approved Plan also provided that litigation related to the certified claim would be subject to the control of an oversight committee consisting of representatives of Doninger's unsecured creditors.

Doninger filed the present action, requesting an equitable adjustment of $266,366.00, which represents the difference between the $104,372.00 awarded by the Contracting Offi-

**2.** On January 19, 1994, the Contracting Officer allowed an increase to the contract based on anticipated cost increases for the 2904 portion of the contract. This adjustment was related to the unperformed 2904 portion of the contract and is not an issue between the parties in this case.

**3.** The rights, powers, and duties of a debtor in possession are described in 11 U.S.C. § 1107(a), which provides:

Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties, except the duties specified in sections 1106(a)(2), (3), and (4) of this title, of a trustee serving in a case under this chapter.

11 U.S.C. § 1107(a) (1994).

cer and the total damages allegedly caused by the government's revised specifications, or for a greater amount to be proven at trial. In its complaint, Doninger attached summary tables in support of its claims and asserted damages divided in the complaint into five counts, alleging, among other grounds, increased costs due to: 1) increased labor, materials and freight costs resulting from the delayed delivery schedule; 2) the relocation of production from New York to North Carolina; 3) materials quantities overruns caused by an increased number of production cycle starts and stops; 4) labor inefficiency; and 5) unabsorbed overhead. [Compl. pp. 5–13]. According to the plaintiff, Doninger seeks damages for

the cost increases it, by definition, incurred as a result of the Revised Delivery Schedule's revisions to the Original Delivery Schedule. The claims are not for the differences between DMP's [4] total historical costs and the historical costs it would have incurred if it had been permitted to perform in accordance with the Original Delivery Schedule. Accordingly, the claims are not founded, either wholly or in part, upon the total cost approach. Rather, the claims reflect the difference between the historical costs DMP would necessarily have incurred if it had performed pursuant to the Original Delivery Schedule with the historical costs it would necessarily have incurred if it had performed pursuant to the Revised Delivery Schedule. The fact that DMP's total job historical performance costs were more than the historical costs it would have incurred if it had performed precisely pursuant to the Revised Delivery Schedule were not included in the Certified Claim and are not included in this Complaint.

In response to defendant's interrogatories, Doninger listed only two individuals with knowledge relating to this case: Mr. Michael Doninger, former President of Doninger Metal Products Corporation, and Ms. Jackie Thompson, the Corporation's former controller. In the Joint Stipulations submitted to the court, the parties also state: "Plaintiff has announced two witnesses in this case; Mr. Michael Doninger and Ms. Jackie Thompson." Mr. Doninger was deposed by defendant on October 16, 1998, and Ms. Thompson was deposed by defendant on February 19, 1999. The plaintiff asserts that the deposition testimony of these two individuals "when read in conjunction with the full record now before this Court, demonstrates that Ms. Thompson and Mr. Doninger, either individually or in combination, have complete knowledge of the evidence supporting each claim and are qualified to testify regarding that knowledge."

The plaintiff relies on nine summary documents [5] prepared by Ms. Thompson to prove the production and delivery costs incurred as a result of the revised specifications issued by the USPS. Although the defendant has requested access to the source documents underlying the nine summary documents, the source documents have not been produced to the defendant during the litigation before this court and according to the plaintiff, were misplaced and are not available for production.

Defendant argues that this case should be dismissed because "the right to maintain" the present action does not belong to Doninger, and, therefore, Doninger lacks standing to sue. Alternatively, defendant argues that it is entitled to summary judgment because the plaintiff "has no evidence of any probative value to present to this Court and, thus, cannot satisfy its burden of proof." Defendant specifically contends that the "totality of the documentary evidence upon which the Corporation proposes that it will rely is, as a matter of law, inadmissible," and that "the two witnesses proposed by the Corporation

4. DMP is an acronym utilized in some of the documents to describe the plaintiff Doninger Metal Products Corporation.

5. The nine summary documents prepared by Ms. Thompson apparently were based upon certain source documents that were once available but are not currently available. These nine summaries should be distinguished from the summary tables attached to the plaintiff's certified claim and complaint. The summary tables, as discussed below and according to Mr. Doninger, were prepared by Mr. Stewart (Plaintiff's counsel) with input from Mr. Doninger and based upon the nine summaries prepared by Ms. Thompson.

lack sufficient knowledge, as fact and/or as expert witness[es], to prove the allegations made in the complaint."

## DISCUSSION

### I. Motion to Dismiss

The defendant has filed a motion to dismiss the complaint for lack of subject matter jurisdiction and/or for failure to state a claim upon which relief can be granted pursuant to Rules 12(b)(1) and 12(b)(4) of the Rules of the United States Court of Federal Claims (RCFC).[6] Subject matter jurisdiction may be challenged at any time by the parties, by the court *sua sponte,* or on appeal. *Booth v. United States,* 990 F.2d 617, 620 (Fed.Cir. 1993), *reh'g denied* (1993); *United States v. Newport News Shipbuilding & Dry Dock Co.,* 933 F.2d 996, 998 n. 1 (Fed.Cir.1991). Once jurisdiction is challenged by the court or the opposing party, the plaintiff bears the burden of establishing jurisdiction. *See McNutt v. Gen. Motors Acceptance Corp. of Ind.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Alaska v. United States,* 32 Fed.Cl. 689, 695 (1995), *appeal dismissed,* 86 F.3d 1178 (Fed.Cir.1996); *Catellus Dev. Corp. v. United States,* 31 Fed.Cl. 399, 404 (1994); *Rocovich v. United States,* 933 F.2d 991, 993 (Fed.Cir.1991). A plaintiff must establish jurisdiction by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed. Cir.1988); *Alaska v. United States,* 32 Fed. Cl. at 695. When construing the pleadings pursuant to a motion to dismiss, the court should grant the motion "only if 'it appears beyond doubt that plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief.'" *Son Broadcasting, Inc. v. United States,* 42 Fed.Cl. 532, 537 (1998) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *see also Hamlet v. United States,* 873 F.2d 1414, 1416 (Fed.Cir.1989); *W.R. Cooper Gen. Contractor, Inc. v. United States,* 843 F.2d 1362, 1364 (Fed.Cir.1988) ("If the ... facts [alleged in the complaint] reveal any possible basis on which the non-movant might prevail, the motion must be denied.").

Pursuant to RCFC 8(a)(1) and the Federal Rules of Civil Procedure 8(a)(1), a plaintiff need only state in the complaint "a short and plain statement of the grounds upon which the court's jurisdiction depends ...." However, "[d]etermination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States,* 124 F.3d 1462, 1465 (Fed.Cir.1997), *reh'g denied* (1997). "[C]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue,* 663 F.2d 713,

6. In its opening brief, defendant represented that its motion to dismiss was based on "Rules 12(b)(2) [personal jurisdiction] and (4) [failure to state a claim] of the Rules of the United States Court of Federal Claims," but then discusses standing as a matter of subject matter jurisdiction. Because the defendant never discusses the issue of personal jurisdiction and because the court does not believe that personal jurisdiction is implicated in the defendant's standing argument, the court has not addressed issues concerning RCFC 12(b)(2). The substance underlying defendant's motion to dismiss is based only on the argument that plaintiff lacks standing. It appears that courts have not developed a uniform consensus regarding which subsection of RCFC 12(b) addresses the standing issue. Some courts have examined standing as a jurisdictional matter. *See First Hartford Corp. Pension Plan & Trust v. United States,* 194 F.3d 1279, 1290 (Fed. Cir.1999) (discussing standing as both a jurisdictional issue and as "prudential limitations on its exercise"); *Brother's Cleaning Serv., Inc. v. United States,* 38 Fed.Cl. 106, 107 n. 1 (1997) ("[D]e-fendant was correct that the only controlling issue is one of standing, which implicates the court's jurisdiction."). Other courts have found that a lack of standing implicates a failure to state a claim. *See Animal Legal Defense Fund v. Quigg,* 932 F.2d 920, 925 n. 6 (Fed.Cir.1991) ("A motion to dismiss under Fed.R.Civ.P. 12(b)(6) for failure to state a claim may rest on plaintiffs' lack of standing."); *Ashkir v. United States,* 46 Fed.Cl. 438, 439 n. 2 (2000) (noting the conflict between examining standing as an issue of subject matter jurisdiction and as a failure to state a claim, but opining that "the better view is that the [standing] issues presented arise under RCFC 12(b)(4) ...."); *Maniere v. United States,* 31 Fed.Cl. 410, 420 (1994) ("Dismissal under RCFC 12(b)(4) implicates whether the plaintiff has presented a justiciable issue before the Court, that is, whether the claimant proffers a case or controversy for which the United States has waived sovereign immunity. The case or controversy requirement implicates a number of analyses, including the standing requirement ....") (citations omitted).

723 (7th Cir.1981), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *see also Bradley v. Chiron Corp.,* 136 F.3d 1317, 1322 (Fed.Cir.1998) ("Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim.").

When deciding on a motion to dismiss based on either lack of subject matter jurisdiction or failure to state a claim, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Conley v. Gibson,* 355 U.S. at 45–46, 78 S.Ct. 99; *accord Boyle v. United States,* 200 F.3d 1369, 1372 (Fed.Cir.2000); *see also Alaska v. United States,* 32 Fed.Cl. at 695; *Highland Falls–Fort Montgomery Cent. School Dist. v. United States,* 48 F.3d 1166, 1167 (Fed.Cir. 1995) (citing *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991)), *cert. denied,* 516 U.S. 820, 116 S.Ct. 80, 133 L.Ed.2d 38 (1995); *Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir.1995); *Hamlet v. United States,* 873 F.2d at 1416. If a defendant or the court challenges jurisdiction or plaintiff's claim for relief, however, the plaintiff cannot rely merely on allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction. *McNutt v. Gen. Motors Acceptance Corp. of Ind.,* 298 U.S. at 189, 56 S.Ct. 780; *see also Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d at 747; *Catellus Dev. Corp. v. United States,* 31 Fed.Cl. at 404–05. When considering a motion to dismiss, the court may examine relevant evidence in order to resolve any disputes as to the truth of the jurisdictional facts alleged in the complaint. *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d at 747; *see also Cedars–Sinai Med. Ctr. v. Watkins,* 11 F.3d 1573, 1584 (Fed.Cir.1993), *cert. denied sub nom. Cedars–Sinai Med. Ctr. v. O'Leary,* 512 U.S. 1235, 114 S.Ct. 2738, 129 L.Ed.2d 859 (1994) ("In establishing predicate jurisdictional facts, a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings, including affidavits and deposition testimony.").

In support of its motion to dismiss, defendant contends that the plaintiff lacks standing to bring the claim at issue because the claim against the USPS "was disclosed in the bankruptcy proceedings by the debtor and was allocated to the Corporation's unsecured creditors." According to the defendant, "[t]he only entity entitled to recover the proceeds from this litigation, if any, is the estate and more particularly the unsecured creditors committee of the Corporation." Defendant asserts that the claim against the USPS does not belong to the debtor because "[t]he Plan, as approved, provided 'otherwise,' specifically that the litigation was subject to the total control of, and would inure to, the exclusive benefit of the Unsecured Creditors' Committee."

The rights and responsibilities regarding a legal claim that is also part of a bankruptcy proceeding "is [an issue] of standing. 'If a cause of action belongs to the estate, then the trustee has exclusive standing to assert the claim.'" *Tyler House Apartments, Ltd. v. United States,* 38 Fed. Cl. 1, 6 (1997) (quoting *In re Educators Group Health Trust,* 25 F.3d 1281, 1284 (5th Cir.1994)); *see also In re Pointer,* 952 F.2d 82, 85–88 (5th Cir.) (finding that a creditor lacks standing because the Bankruptcy Code establishes that an action to avoid a transfer of the estate's property under 11 U.S.C. § 549 "belong[s] solely to the trustee or debtor-in-possession"), *cert. denied sub nom. Pointer v. Carrollton–Farmers Branch Indep. Sch. Dist.,* 505 U.S. 1222, 112 S.Ct. 3035, 120 L.Ed.2d 904 (1992); *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 118 (2nd Cir.1991) ("It is well settled that a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself."). Thus, the debtor may have standing to assert a claim if the right to bring the claim belongs to the debtor.

To determine the rights and responsibilities regarding the claim against the USPS, the court must examine Chapter XI of the Bankruptcy Code, 11 U.S.C. §§ 1101–1330 (1994). In general, in a Chapter XI bankruptcy action in which there is no need for a

trustee and one has not been appointed, it is presumed that the debtor will continue to manage the debtor's affairs as the debtor in possession. *See* 9 Am.Jur.2d. *Bankruptcy* § 360 (1999). In a Chapter XI case, the "debtor in possession" means the debtor "except when a person that has qualified under section 322 of this title is serving as trustee in the case." 11 U.S.C. § 1101(1). Subject to certain exceptions not at issue here,[7] the debtor in possession "has virtually all the rights, powers, and duties of a Chapter XI trustee, including being the representative of the estate and having the capacity to sue and be sued." 9 Am.Jur.2d. *Bankruptcy* § 358 (1999); *see* 11 U.S.C. § 1107(a).

■ Once a debtor files for Chapter XI bankruptcy, the debtor's property, as listed in the statute, including any rights arising out of contracts, becomes property of the bankruptcy estate. 11 U.S.C. § 541. However, once a reorganization plan for distribution of the debtor's assets has been confirmed, "the confirmation of a plan vests all of the property of the estate in the debtor" except "as otherwise provided in the plan or the order confirming the plan." 11 U.S.C. § 1141(b). A confirmation plan may provide for "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any [claim or interest belonging to the debtor or to the estate] ...." 11 U.S.C. § 1123(b)(3)(B). Thus, the provisions of the plan determine the rights and responsibilities regarding any claims against third parties, and therefore, the parties with standing to enforce the claims listed in the plan. *See, e.g., McFarland v. Texas Gen. Petroleum Corp. ex rel. Leyh,* 52 F.3d 1330, 1335 n. 4 (5th Cir.1995) (finding that the debtor can assert an action for the benefit of the estate, in this case an avoidance action, only if the

plan gives the debtor standing to assert such action). In interpreting reorganization plans confirmed by a bankruptcy court, the plan should be construed according to the general principles guiding the interpretation of contracts. *See In re Stratford of Texas, Inc.,* 635 F.2d 365, 368 (5th Cir.1981); *see also In re ATEK Info. Servs., Inc.,* No. 92–61232, 1994 WL 263431, at *4 (Bankr.N.D.Ohio May 26, 1994) (citing *In re Harstad,* 155 B.R. 500, 510 (Bankr.D.Minn.1993)).

■ Plaintiff and defendant agree that the provisions of the confirmation Plan dictate the rights and responsibilities regarding the claim against the USPS. Plaintiff, however, does not agree with defendant's view that based on the Plan provisions, Doninger lacks standing to sue. Plaintiff asserts that "both the Plan and its Modification provide, in detail and with clarity, that only DMP had standing to file and prosecute the claim." Because the court finds that the Plan provisions do address the rights and responsibilities regarding the claim against the USPS, the USPS claim does not automatically revest in the debtor after confirmation of the Plan, and pursuant to 11 U.S.C. § 1141(b), the Plan provisions govern the issue of whether Doninger has standing to bring the present claim.

Doninger's November 30, 1995 Plan of Reorganization specifically addresses plaintiff's claim against the USPS. Section 6.3(b) of the Plan, as modified, provides:

*Postal Service Damage Claim.* Debtor has asserted, by certified claim, a damage claim against the United States [P]ostal Service under Contract No. 059990–92–B–0840 [8] in an amount approximating $575,377 (the "USPS Damage Claim").... The recovery on the USPS Damage Claim subject to the provisions and limitation of

---

7. The differences between the rights and duties of a trustee and a debtor in possession are set forth in 11 U.S.C. § 1107(a) as follows:

Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties, except the duties specified in sections

1106(a)(2), (3), and (4) of this title, of a trustee serving in a case under this chapter.
11 U.S.C. § 1107(a).

8. There appears to be an error in the Plan language because the contract number for the present claim is 059990–92–B–0804. However, all the other information describing the "USPS Damage Claim" referenced in the Plan appears to be consistent with the claim at issue in the present case.

paragraph 6.3(b), is included in the definition of Disposition Proceeds set out in paragraph 1.31:

(1) The amount of the USPS Damage Claim allowed by the Postal Service without any further litigation by the Debtor (the "Initial Allowance") is the amount subject to the Committee Election set out below.

(2) If the Unsecured Committee is not satisfied with the Initial Allowance, it can elect (the "Committee Election") to have the Debtor, at the expense of Class 10 Unsecured Creditors' distribution share of the Disposition Proceeds (subject to the provisions of subparagraph 3 below), litigate the USPS Damage Claim by counsel selected by the Unsecured Committee, such election to be evidenced by written notice to Debtor, and its counsel of record.

(3) any litigation of the United States Postal Service Damage Claim or any other cause of action, litigated against the United States Postal Service shall be subject to oversight by the Oversight Committee....

(emphasis in original).

Section 1.31, as modified, provides that the "Disposition Proceeds" include the "recovery proceeds on Debtor's Postal Service Damage Claim." Section 6.4 establishes the procedure for the distribution of the "Disposition Proceeds," and, in pertinent part, states:

Counsel for Debtor shall pay-over to the Disbursing Agent the Disposition Proceeds as defined in Paragraph 1.31, less a reasonable holdback for attorney fees and expenses relating to the conduct of the preference or postal service litigation and consummation of the Plan of Reorganization. The Disbursing Agent shall make distributions to Class 10 Unsecured Creditors of Disposition Proceeds received by him as often as practicable, determined in his discretion.

Doninger's Plan of Reorganization specifically lists the litigation against the USPS and details the process for pursuing this claim and distributing the proceeds. The Plan states that the Unsecured Creditors Committee (Committee) "can have the Debtor ...

litigate the USPS Damage Claim ...." and that "[c]ounsel for Debtor shall pay-over to the Disbursing Agent the Disposition Proceeds," which include the recovery from the USPS litigation. The Plan clearly contemplates that Doninger will bring the claim against the USPS if the Committee provides Doninger with written notice directing Doninger to pursue the litigation. The Plan also anticipates that Doninger's counsel will initially receive the proceeds from the USPS litigation. Contrary to the defendant's assertions, the Plan provisions do not contemplate that the Committee will bring the USPS claim. Although the Committee decides whether to pursue this litigation, it does so with a lawsuit brought by Doninger and benefits from the litigation through Doninger.

Under the Plan, the Committee gains the right to proceeds from the litigation against the USPS and the right to exert a certain amount of oversight control over the litigation. Doninger's inability to retain the recovery from this litigation and the requirement to allow the Committee to exercise oversight over plaintiff's conduct in the litigation are not dispositive factors for deciding whether Doninger has the right to enforce the claim. Doninger has standing to enforce the claim if the requirement of Committee approval is met according to the terms of the Plan, despite simultaneously owing an obligation to the Committee to re-direct the proceeds from the litigation to allow a certain amount of oversight of the litigation. If Doninger violates its contractual obligations to the Committee, the Committee may file a separate action against Doninger to enforce the provisions of the Plan.

Some courts have required language in the plan which "specifically reserve[s] the right to pursue claims of this sort post-confirmation." *Harstad v. First Am. Bank,* 39 F.3d 898, 903 (8th Cir.1994); *see In re P.A. Bergner & Co.,* 140 F.3d 1111, 1117 (7th Cir.) ("Under the Bankruptcy Code, the debtor must specifically identify in its reorganization plan the claims it wishes to pursue postconfirmation."), *cert. denied sub nom. Bank One, Milwaukee, N.A. v. P.A. Bergner & Co.,* 525 U.S. 964, 119 S.Ct. 409, 142 L.Ed.2d 332 (1998); *In re ATEK Info. Servs., Inc.,* 1994

WL 263431, at *4 ("There must be an express reservation of causes of action to be pursued under Section 1123(b)(3) whether by the debtor, a trustee or a representative of the estate appointed for that purpose."). However, courts have emphasized that one of the policy justifications behind a specific reservation pursuant to § 1123(b)(3) centers on providing creditors with adequate notice of "any potential causes of action that might enlarge the estate—and that could be used to increase payment to the creditors." *Harstad v. First Am. Bank,* 39 F.3d at 903; *see In re Paramount Plastics, Inc.,* 172 B.R. 331, 334 (Bankr.W.D.Wash.1994) ("[11 U.S.C.] § 1125 [9] ... requires the disclosure of 'adequate information' to allow a claimant to make an informed judgment about the plan."). In other words, the specific reservation requirement serves to prevent the debtor from pursuing claims and retaining proceeds from claims that rightfully belong to the debtor's creditors.

The language of the Plan in the present case provides sufficient notice to the creditors in order for them to make fully informed decisions when voting on the Plan. The Plan clearly states that the Committee "may have the Debtor bring the claim against the USPS" if the Committee elects to do so. In addition, the Plan contemplates that counsel for the Debtor will initially receive the proceeds from the litigation, also suggesting to Doninger's creditors that Doninger will bring the action against the USPS. Allowing the plaintiff to pursue the present claim through a lawsuit brought by Doninger would further the policy of protecting Doninger's creditors because the plaintiff has the most information and might well be in the best position to pursue the litigation.

Defendant argues that the court's reasoning in *Phoenix Petroleum Co. v. United States,* 40 Fed.Cl. 862 (1998), *rev'd on other grounds,* 215 F.3d 1345 (Fed.Cir.1999), "is persuasive and would require dismissal for lack of standing." In *Phoenix Petroleum,* the plaintiff sought to bring a claim against the Defense Fuel Supply Center over an allegedly illegal provision under the contract entered into between the plaintiff and the government. Plaintiff failed to schedule or even to identify the contract claim against the government in its plan of reorganization. *Id.* at 867. The court reasoned that "§ 1123(b)(3) requires debtors to use specific language of reservation so that creditors are sufficiently informed, before they vote on the debtor's plan of reorganization, about potential causes of actions that might enlarge the estate." *Id.* at 866. Thus, the court held that "plaintiff lack[ed] standing to bring this suit for its own benefit because plaintiff did not schedule the quantum meruit claim or retain it pursuant to § 1123(b)(3)." *Id.* at 867. The present case is distinguishable from *Phoenix Petroleum* because this case does not implicate the policy concerns regarding lack of notice to the creditors or deprivation of funds which rightfully belong to the creditors. The claim against the USPS was disclosed to Doninger's creditors before the Plan was confirmed, and the Plan provides that all the proceeds from the litigation will be distributed for disbursement as part of the bankruptcy estate. Doninger's Plan establishes clear terms providing that Doninger will litigate the USPS claim on behalf of the estate if the Committee provides Doninger and its counsel of record with the written notice required by Section 6.3(b)(2) of the Plan.

In the instant case, the record before the court contains no evidence of any written notice from the Committee to Doninger or to Doninger's counsel of record, directing Doninger to bring the present claim against the USPS. After requesting the parties to search its records and to produce a copy of this written notice to the court, the defendant notified the court that it had no such record.

---

**9.** Section 11 U.S.C. § 1125, in pertinent part, states:

> An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets.
>
> 11 U.S.C. § 1125(b).

On July 19, 2001, the plaintiff also reported that "a search of the Plaintiff's records did not reveal the requested written notice from the Unsecured Creditors Committee showing its election to pursue the instant litigation." The plaintiff instead offers several other documents, including the affidavits of Mr. Gregory B. Crampton, attorney of record for Doninger in its Chapter 11 case filed in the United States Bankruptcy Court, Eastern District of North Carolina, and of Mr. N. Hunter Wyche, Jr., counsel to the Unsecured Creditors Committee in Doninger's Chapter 11 case filed in the United States Bankruptcy Court, Eastern District of North Carolina. In his affidavit, Mr. Crampton states that "[t]he Unsecured Creditor's Committee in Debtor's Chapter 11 case specifically approved the Debtor proceeding with its litigation against the United States Postal Service" but that "[h]e has been unable to locate a written letter from [members of the Oversight Committee] memorializing the Unsecured Creditor's Committee's and Oversight Committee's approval of the United States Postal Service litigation." Similarly, Mr. Wyche states in his submitted affidavit that he "cannot recall whether there is such a letter," but that "[t]he creditors knew the claim was being pursued and we frequently discussed the status with Mr. Crampton and among ourselves." In addition, the plaintiff provided the court with a few selected copies of letters from Mr. Crampton to the Oversight Committee providing status reports on the USPS litigation, Chapter 11 post-confirmation reports, a motion to the United States Bankruptcy Court containing references to the USPS litigation, and a letter from Mr. Wyche to Mr. Crampton requesting a "very brief status report on the postal damage claim."

Mr. Wyche's affidavit also states that "[t]o the extent that N. Hunter Wyche, Jr. as attorney for the Unsecured Creditor's Committee or Douglas R. Ghidina as a member of the Oversight Committee did not provide such written notice to counsel for the Debtor, such protective provision was waived by both the Unsecured Creditors Committee, the Oversight Committee, and the Debtor." However, no proof is offered by the plaintiff that Mr. Wyche is currently authorized to speak on behalf of the Unsecured Creditors' Committee, and no writing demonstrating that a contemporaneous waiver occurred is offered by the plaintiff.

The applicable Plan explicitly requires that the Committee election to pursue the litigation against the USPS be "evidenced by written notice to Debtor, and its counsel of record," and the Plan provisions govern whether or not the plaintiff has standing in this case. Because there is no evidence in the record of any authorized written notice, as required by the Plan, the court finds that the plaintiff lacks standing to bring the present claim against the USPS. Furthermore, even if the additional affidavits, documents and representations regarding a waiver recently provided by the plaintiff were sufficient to prove that the Committee had provided written notice to Doninger and its counsel of record or that the Committee had properly waived this specific requirement of the Plan, as discussed below, the plaintiff does not present sufficient evidence to show a genuine dispute over material facts which would preclude the entry of summary judgment against it.

## II. Summary Judgment

Because the standing question has been complicated by the recent submissions from plaintiff's counsel, which according to the plaintiff, allege that the Committee provided or waived the requisite written notice to comply with the terms of the Plan, in an abundance of caution, the court proceeds to fully address the issues raised by defendant's summary judgment motion and plaintiff's opposition to the motion. Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

RCFC 56(c) provides that in order for a motion for summary judgment to be granted, the moving party must demonstrate that the moving party is entitled to judgment as a matter of law and that there are no genuine issues of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Avenal v. United States*, 100 F.3d 933, 936 (Fed.Cir.1996) (*reh'g denied*); *Creppel v. United States*, 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.*, 974 F.2d 1304, 1306 (Fed.Cir. 1992); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir.1991). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Lane Bryant, Inc. v. United States*, 35 F.3d 1570 (Fed.Cir.1994). Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505. Summary judgment is appropriate when the sole dispute concerns the interpretation of a government contract, a question of law. *See Olympus Corp. v. United States*, 98 F.3d 1314, 1316 (Fed.Cir.1996).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Co. v. United States*, 157 F.3d 849, 854 (Fed.Cir. 1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. 2505. When the record could not lead a rational trier of fact to find for the nonmov-

ing party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

If, however, the nonmoving party produces sufficient evidence to raise a question· as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. at 587–88, 106 S.Ct. 1348; *Wanlass v. Fedders Corp.*, 145 F.3d 1461, 1463 (Fed. Cir.1998) (*reh'g denied*); *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1575 (Fed.Cir.1994) (*reh'g denied*); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence which establishes the existence of the elements essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. 2548; *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. at 679. The moving party is entitled to summary judgment "when it is shown that the nonmovant cannot prevail even on its version of the facts, thus rendering a trial futile." *Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*, 119 F.3d 953, 955 (Fed.Cir.1997)

(*reh'g denied*) (citing *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Allied Colloids, Inc. v. American Cyanamid Co.*, 64 F.3d 1570, 1573, 35 U.S.P.Q.2d 1840, 1841 (Fed.Cir.1995)).

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the non-moving party will need to go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

Although the plaintiff opposes summary judgment and argues for a trial on the merits, defendant contends that it is entitled to summary judgment because the plaintiff "has no evidence of any probative value to present to this Court and thus, cannot satisfy its burden of proof." Defendant specifically argues that the two witnesses identified by the plaintiff and the documents provided during discovery fail to support the elements on which plaintiff bears the burden of proof. In response, plaintiff argues that the evidence presented to the court is sufficient to support each of its claims and states that the "deposition testimony [of Mr. Doninger and Ms. Thompson], when read in conjunction with the full record now before this Court, demonstrates that Ms. Thompson and Mr. Doninger, either individually or in combination, have complete knowledge of the evidence supporting each claim and are qualified to testify regarding that knowledge."

■ The United States Court of Appeals for the Federal Circuit has found that "[t]o receive an equitable adjustment from the Government, a contractor must show three necessary elements—liability, causation, and resultant injury." *Servidone Constr. Corp. v. United States*, 931 F.2d 860, 861 (Fed.Cir.1991) (citing *Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180, 199, 351 F.2d 956, 968 (1965)). Thus, "the government contractor seeking an equitable adjustment bears the burden of proving lia-

bility, causation, and resultant injury." *Ralph L. Jones Co., Inc. v. United States*, 33 Fed.Cl. 327, 331 (1995) (citing *Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180, 199, 351 F.2d 956, 968 (1965); *Electronic & Missile Facilities, Inc. v. United States*, 189 Ct.Cl. 237, 253, 416 F.2d 1345, 1355 (1969)); *see Datalect Computer Servs., Ltd. v. United States*, 41 Fed.Cl. 720, 722 (1998), *aff'd*, 215 F.3d 1344 (Fed.Cir.1999) (table), *cert. denied*, 529 U.S. 1037, 120 S.Ct. 1530, 146 L.Ed.2d 345 (2000).

■ To recover under the changes clause of the contract, based on a directed or constructive change for work beyond that required by the contract, it must be clear that:

> ... each of the other elements of the standard "Changes" or "Extras" clause has been present—the contracting officer has the contractual authority unilaterally to alter the contractor's duties under the agreement; the contractor's performance requirements are enlarged; and the additional work is not volunteered but results from a direction of the Government's officer.

*Len Co. & Assocs. v. U.S.*, 181 Ct.Cl. 29, 38, 385 F.2d 438, 443 (1967).

■ Similarly, the court in *Sterling Millwrights, Inc. v. United States* articulated the grounds for prevailing on an equitable adjustment claim pursuant to the Changes clause in a government contract as:

> A contractor may seek an equitable adjustment to compensate for increased costs of performance flowing from changes that alter the work to be performed under the contract. To prevail on its claim for equitable adjustment(s), plaintiff must demonstrate first that any increased costs arose from conditions differing materially from those indicated in the bid documents, and that such conditions were reasonably unforeseeable in the light of all the information available to the contractor. Plaintiff must also show that its contract costs actually increased, and that the cost increases were the direct and necessary result of the change.

*Sterling Millwrights, Inc. v. United States*, 26 Cl.Ct. 49, 72 (1992) (citations omitted); *see*

also *Ralph L. Jones Co., Inc. v. United States*, 33 Fed.Cl. at 331–32.

■ The courts also recognize that a contract change can and does create costs beyond those attributable to the changes themselves:

> Under the Changes clause, plaintiff can recover delay damages as compensation for extended performance due to the change. *Pathman Constr. Co. v. United States*, 227 Ct.Cl. 670, 673 [652 F.2d 70] (1981) [ (table) ]; *Merritt–Chapman & Scott Corp. v. United States, supra,* [192 Ct.Cl. 848] at 851, 429 F.2d [431] at 432; *Paul Hardeman, Inc. v. United States, supra,* [186 Ct.Cl. 743] at 749–752, 406 F.2d [1357] at 1361–1363.

*G.M. Shupe, Inc. v. United States,* 5 Cl.Ct. 662, 699 (1984).

■ The calculation of the equitable adjustment is based upon the difference between the reasonable cost for performing the work as changed and the reasonable cost for performing the work according to the original contract specifications. *J.L. Simmons Co. v. United States,* 188 Ct.Cl. 684, 704, 412 F.2d 1360, 1370 (1969) (per curiam); *see also Miller Elevator Co., Inc. v. United States,* 30 Fed.Cl. 662, 701, *appeal dismissed,* 36 F.3d 1111 (Fed.Cir.1994) (table). The courts have recognized a variety of methods for proving the amount of the equitable adjustment to which the contractor is entitled. *See Delco Elec. Corp. v. United States,* 17 Cl.Ct. 302, 321 (1989), *aff'd,* 909 F.2d 1495 (Fed.Cir. 1990) (table). "A contractor must prove its costs using the best evidence available under the circumstances. The preferred method is through the submission of actual cost data." *Id.* (citing *Cen–Vi–Ro of Texas, Inc. v. United States,* 210 Ct.Cl. 684, 685, 538 F.2d 348 (1976) [ (table) ]). Logically, to prove damages through the actual cost method, the plaintiff must provide the court with specific documentation of the expenses caused by the government's change. *See Dawco Constr., Inc. v. United States,* 930 F.2d 872, 882 (Fed.Cir.1991), *rev'd on other grounds, Reflectone, Inc. v. Dalton,* 60 F.3d 1572 (Fed. Cir.1995); *see also Delco Elec. Corp. v. United States,* 17 Cl.Ct. at 321 ("In maintaining cost data, a contractor should segregate costs associated with the change where it is feasible to do so, and especially where the contractor can anticipate submitting a large claim.").

In a number of complex contract cases, however, exact computation of damages may prove to be extremely difficult. Therefore, courts have held that, "[t]he ascertainment of damages, or of an equitable adjustment, is not an exact science, and where responsibility for damage *is* clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision." *Elec. & Missile Facilities, Inc. v. United States,* 189 Ct.Cl. 237, 257, 416 F.2d 1345, 1358 (1969) (citations omitted, emphasis in original). The plaintiff will meet its burden of proving damages if it "furnishes the court with a reasonable basis for computation, even though the result is only approximate." *Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. 180, 199, 351 F.2d 956, 968 (1965); *see also Capital Elec. Co. v. United States,* 729 F.2d 743, 746 (Fed.Cir.1984); *Addison Miller, Inc. v. United States,* 108 Ct. Cl. 513, 557, 70 F.Supp. 893, 900, *cert. denied,* 332 U.S. 836, 109 Ct.Cl. 869, 68 S.Ct. 217, 92 L.Ed. 408 (1947); *Datalect Computer Servs.,* 41 Fed.Cl. at 722; *Jackson v. United States,* 12 Cl.Ct. 363, 366–67 (1987).

■ Courts have recognized two alternative methods for calculating damages if actual costs cannot be documented. One alternative method, the "total cost" method, "derives damages as the difference between a contractor's actual costs and its original bid." *Servidone Constr. Corp. v. United States,* 931 F.2d at 861. Because this method provides less assurance that the plaintiff is being precisely compensated for the exact amount of damage suffered,

> "[t]his theory has never been favored by the court and has been tolerated only when no other mode was available and when the reliability of the supporting evidence was fully substantiated. (Citations omitted.) The acceptability of the method hinges on proof that (1) the nature of the particular losses make it impossible or highly impracticable to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual

costs were reasonable; and (4) it was not responsible for the added expenses." *Boyajian v. United States,* 191 Ct.Cl. 233, 253–54, 423 F.2d 1231, 1243 (1970).

■ The second alternative method, the "jury verdict" method, is "most often employed when damages cannot be ascertained by any reasonable computation from actual figures," but it "is not favored and may be used only when other, more exact, methods cannot be applied." *Dawco Constr., Inc. v. United States,* 930 F.2d at 880. In the underlying Claims Court decision in *Dawco Construction, Inc. v. United States,* 18 Cl.Ct. 682 (1989), the trial judge discussed the conditions under which the jury verdict might be useful as follows: "Notwithstanding that a judge of this court is the sole trier of fact, the court has held that a jury verdict approach to the computation of damages is proper when it is not possible for the plaintiff to prove actual damages, but sufficient information exists to enable the court to arrive at a fair approximation of the damages." *Id.* at 698 (citations omitted). In *S.W. Elec. & Mfg. Corp. v. United States,* 228 Ct.Cl. 333, 655 F.2d 1078 (1981), the Court of Claims applied the jury verdict method because "[w]hen confronted with the clear liability of defendant and the plaintiff's efforts to present all available evidence on damages, the [court] was under a heavy obligation to provide compensation. While there was *'uncertainty as to the extent of the damage, * * * there was none as to the fact of damage.'* (Emphasis in original)." *Id.* at 351, 655 F.2d at 1088 (quoting *Joseph Pickard's Sons Co. v. United States,* 209 Ct.Cl. 643, 650, 532 F.2d 739, 743 (1976)). However, as noted by the Court of Appeals for the Federal Circuit, "[i]ts [the jury verdict method's] primary peril, as evidenced in this [*Dawco* ] case, is the risk that unrealistic assumptions will be adopted and extrapolated, greatly multiplying an award beyond reason, and rewarding preparers of imprecise claims based on undocumented costs with unjustified windfalls." *Dawco Constr., Inc. v. United States,* 930 F.2d at 882. Thus, the jury verdict method is resorted to only when the plaintiff has shown: "(1) that clear proof of injury exists; (2) that there is no more reliable method for computing damages; and (3) that the evidence is

sufficient for a court to make a fair and reasonable approximation of the damages." *Id.* at 880 (citing *WRB Corp. v. United States,* 183 Ct.Cl. 409, 425, 1968 WL 9146 (1968)).

■ However, " 'leniency as to the actual mechanics of computation does not relieve a contractor of its basic and essential burden of establishing the fundamental facts of liability, causation, and resultant injury.' " *Miller Elevator Co., Inc. v. United States,* 30 Fed. Cl. at 702 (quoting *G.M. Shupe, Inc. v. United States,* 5 Cl.Ct. 662, 737 (1984)). For example, in a case in which there was no comparative data, no standards and no corroboration, "the mere expression of an estimate as to the amount of productivity loss by an expert witness with nothing to support it will not establish the fundamental fact of resultant injury nor provide a sufficient basis for making a reasonably correct approximation of damages." *Luria Bros. & Co. v. United States,* 177 Ct.Cl. 676, 696, 369 F.2d 701, 713, (1966) (citing *Wunderlich Contracting Co. v. United States,* 351 F.2d 956, 968, 173 Ct.Cl. 180, 199 (1965)).

Although courts have recognized alternative methods for proving damages, the plaintiff asserts that its claims "are not founded, either wholly or in part, upon the total cost approach. Rather, the claims reflect the difference between the historical costs DMP would necessarily have incurred if it had performed pursuant to the Original Delivery Schedule with the historical costs it would necessarily have incurred if it had performed pursuant to the Revised Delivery Schedule." Thus, the court considers defendant's motion for summary judgment and plaintiff's opposition in the context of the plaintiff's reliance on an apparent actual cost method of proving damages.

To prove its claim for equitable adjustment, the plaintiff relies on 1) the two certified claims submitted to the contracting officer, 2) the plaintiff's responses to defendant's interrogatories, 3) the depositions of plaintiff's two witnesses (Mr. Michael Doninger and Ms. Jackie Thompson), and 4) the nine summaries prepared by Ms. Thompson. The defendant, however, points to those very

same depositions and summaries, and to admissions made in plaintiff's filings as demonstrating that there is an absence of evidence sufficient to support the plaintiff's case. The plaintiff alleges that the nine summary documents prepared by Ms. Thompson are "[t]he documents supporting Exhibits F, G, H, I, J, K, L, and M [the tables attached to plaintiff's complaint], and their respective sub-parts" which, in table format, show the damages allegedly incurred by Doninger as a result of the government's unilateral change. Defendant, however, argues that these nine summary documents on which the plaintiff relies cannot be substantiated either by contemporaneous source documents or by the testimony of plaintiff's two witnesses. The defendant points to the plaintiff's admissions in its submission to the court that the source documents from which Ms. Thompson prepared her summaries "were not provided to the Postal Service during discovery" and "cannot now be located."

The plaintiff also alleges that the deposition testimony of Mr. Doninger and Ms. Thompson "when read in conjunction with the full record now before this Court, demonstrates that Ms. Thompson and Mr. Doninger, either individually or in combination, have complete knowledge of the evidence supporting each claim and are qualified to testify regarding that knowledge." Regarding the plaintiff's two witnesses, however, the defendant identifies portions of both deposition transcripts which it alleges demonstrate that the witnesses cannot affirmatively verify the amounts claimed in the complaint as the damages suffered by the plaintiff due to the change imposed by the government. Specifically, the defendant points to portions of Mr. Doninger's deposition transcript, including those which demonstrate that the amounts claimed in the certified claim, signed by Mr. Doninger, were developed by relying on figures "generated by Jackie Thompson based on our records and information," and that he only gave input that was "broadbrush logic and reasoning" based on his experience. During his deposition, Mr. Doninger provided the following testimony:

Q. . . . . Who participated in preparing the certified claim?

A. Mr. Jim Stewart (Plaintiff's counsel) and myself.

Q. How were the numbers arrived at in that certified claim?

A. Oh, I'm certain that Mr. Stewart relied heavily on information that he received from Jackie Thompson who was our controller at that time and myself.

Q. Then the numbers were not prepared by Ms. Thompson, they were prepared by Mr. Stewart based on information that he had been supplied by his clients?

A. Yeah, I think that's safe to say. A lot of the numbers and information was [sic] generated by Jackie Thompson based on our records and information.

Q. What records and information?

A. Book, books and records, how do you describe it, the bookkeeping records, standard corporation bookkeeping records.

Q. Okay. Those bookkeeping records, did they go back beyond the date of the award of this contract?

A. Oh, I have no idea.

Q. So Jackie Thompson would know where she got the figures, where you do not?

A. That's correct.

In this exchange, Mr. Doninger indicated that the amounts claimed by the plaintiff relied heavily on figures prepared by Ms. Thompson, to which he did not have sufficient knowledge to testify. Therefore, Mr. Doninger is not an appropriate witness to validate the nine summaries offered and relied upon by the plaintiff.

In his deposition, Mr. Doninger further described the extent of his input in preparing the tables attached to and the amounts requested in the certified claim:

Q. Okay. So the testimony as to all of these [tables] that you have answered the same is that James Stewart prepared them relying on information provided by Jackie Thompson?

A. That's correct.

Q. Okay.

MR. STEWART: And just to comment, I thought the further answer was with advice or input from you.

THE WITNESS (Mr. Doninger): Right, as I stated previously, I would review these with Jim, he would ask me questions about them as he was preparing them, and I would give broadbrush logic and reasoning for this information upon reviewing it with him.

BY MS. RUBIANES (Defendant's counsel):

Q. As you were giving this input that you describe as broadbrush reasoning, did you at any time rely on any hard data?

A. Only the data that was presented to Jim Stewart from Jackie Thompson.

Q. So then Jackie Thompson provided whatever hard data Mr. Stewart used in compiling these tables, you gave input that was broadbrush reasoning based on your experience?

A. Uh-huh.

Q. And that's the way the tables were put together?

A. That's correct.

The defendant also advances portions of Ms. Thompson's testimony which demonstrate that Ms. Thompson could not testify that the amounts claimed by the plaintiff represented the damages caused by the government's unilateral change. During Ms. Thompson's deposition, she provided the following information:

Q. Now have you ever before today put that information together to arrive at the kind of conclusion that is proposed in this complaint that the additional material costs that were in count 1 that were claimed were the result of the change made by the government to this contract?

A. I did not put those together. This schedule and the claim was prepared by Mr. Stewart.

Q. So before today, you've never made this analysis, you would not be able to say that you sat down and you ran these numbers and this is what the numbers ended up being?

A. No, I did not prepare this.

Q. And to shorten this line of questioning, that is true as to the analysis of the $48,092 for additional labor costs in count 1, it is true of the $35,392 in additional material costs in count 1 and it's also true as to the $3,105 in additional freight costs contained in count 1?

A. That's true.

. . . .

Q. Now in terms of count 2, as you explained it and as I'm understanding it, you explained it, you're saying because the contract was stretched out by virtue of that alone, we incurred an additional $33,018 in labor and freight costs, is that a fair representation of what you just testified to?

A. Yes, I believe so.

Q. At any time is an analysis made as to what amount of those costs was not the direct result or was not the result of the change in schedule in this case?

A. No.

Q. That analysis is not made there?

A. No, it is not.

Q. Let's go to count 3, material quantities overrun, total claim of $65,840.

A. Yes.

Q. You've studied count 3?

A. I'm reading it now. I'm reading count 3 on page 10.

Q. Tell me when you've completed your reading.

A. Count 3 states that there were a total of $243,000 roughly of material overruns, however only 65,000 of them are attributed to the revised delivery schedule of coil stock—

Q. Very specifically, how exactly was that number arrived at or do you not know?

A. I don't know how that was—I can look at Exhibit L, but I—

Q. Go ahead. What I want to know is, can you explain to me exactly how that number was arrived at?

A. I cannot see the tieback. I can see the total and I have followed during the break the total overrun to my schedules

but the reduction from the 243 to the 65,000 I don't see evident in the schedule.

Q. So it is not simply a matter of looking at Exhibit L and looking at Exhibits 5, 6 and 7 and arriving at $65,000, is it, it's not that simple?

A. I don't think so.

Q. What else would have to be a part of the analysis that would yield the number $65,840?

A. Either other explanations for the overruns or perhaps other explanation of the reasonableness of the original estimate to begin with.

Q. And your testimony is you have no idea what those numbers would be?

A. I don't have those, no.

Q. Let's look at count 4, labor inefficiency. Count 4 makes a claim of $107,134 allegedly caused by the extension and delay of the delivery schedules.

Would you be able to explain to me how that number is arrived at?

A. I can't. I will look at Exhibit M.

. . . .

Q. Where in these documents is there an analysis of how much of the alleged labor inefficiency was due directly to the decision to change the schedule in this case?

A. There is not.

. . . .

Q. . . . . Let's go to count 5, please. Count 5 alleges a claim for unabsorbed overhead delay damages and the total amount of the claim in count 5 is $226,366 allegedly due to a 133 day delay.

My question to you is, are you able to, using the exhibits that you prepared and the exhibits appended to the complaint which were not prepared by you, support that that number is a correct number and that that number is attributable to the change by the government to this contract?

A. I can't tell from the exhibits and I'm not familiar with how that calculation was made.

Based on the depositions, neither Mr. Doninger nor Ms. Thompson seem to be able to offer much specific information on how the claim information was developed. Thus, the defendant successfully argues, based on the deposition testimony of both Mr. Doninger and Ms. Thompson and statements made in plaintiff's filings with the court, that Doninger cannot establish the government's liability beyond the amount awarded by the contracting officer or the fact that Doninger's additional costs were caused by the government's change. Because liability and causation are essential elements for receiving an equitable adjustment for which the plaintiff bears the burden of proof at trial, and because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," *Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. 2548, the court finds that the defendant has met its initial burden of demonstrating an absence of evidence to support the plaintiff's case.

Once the defendant has met its initial burden, the burden shifts to the plaintiff to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548 (quoting Fed. R. Civ. Pro. 56(e)). In support of its case, the plaintiff relies on the nine summary documents prepared by Ms. Thompson and alleges that these nine documents are summaries of Doninger's revenues and expenses, materials invoices, labor hours, and labor rates during the performance of the contract at issue. The plaintiff states that "[t]hose summaries, which detail DMP's historical costs during the performance of this Contract, are the foundation of the claims and it is from them that all analyses of those claims must proceed." Plaintiff argues that Ms. Thompson's nine summaries are admissible "[a]s summaries of voluminous underlying business records" and asserts that "the entries on those nine documents are the sources for the entries on the Complaint Exhibits, and, accordingly, those Exhibits are essentially self-proving."

█ Summary documents cannot prove their own validity, and the admissibility of summaries is limited by Rule 1006 of the Federal Rules of Evidence. Rule 1006 provides that:

The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court. Fed.R.Evid. 1006. The text of Rule 1006 details four elements for establishing the admissibility of a summary. *See Bath Iron Works Corp. v. United States,* 34 Fed.Cl. 218 (1995), *aff'd,* 98 F.3d 1357 (Fed.Cir.1996) (table). The trial court in *Bath Iron Works* laid out the four elements as follows:

First, the summarized writings must be so voluminous so as to be unable to be conveniently examined in court. *United States v. Duncan,* 919 F.2d 981, 988 (5th Cir. 1990); *United States v. Robinson,* 774 F.2d 261, 276 (8th Cir.1985). Second, the underlying evidence must itself be admissible. *Martin v. Funtime, Inc.,* 963 F.2d 110, 116 (6th Cir.1992); *United States v. Johnson,* 594 F.2d 1253, 1255 (9th Cir. 1979). Third, the original or copies of the summarized writings must be made available to the opposing party. *Hackett v. Housing Authority of San Antonio,* 750 F.2d 1308, 1312 (5th Cir.1985); *United States v. Kim,* 595 F.2d 755, 764 (D.C.Cir. 1979). And, fourth, the proposed summary (or chart or calculation) must accurately summarize (or reflect) the underlying document(s) and only the underlying document(s). *Vasey v. Martin Marietta Corp.,* 29 F.3d 1460, 1468–69 (10th Cir. 1994); *United States v. Drougas,* 748 F.2d 8, 25 (1st Cir.1984); *Needham [v. White Labs., Inc.],* 639 F.2d [394,] 403 [(7th Cir. 1981)]; *Pritchard v. Liggett & Myers Tobacco Co.,* 295 F.2d 292, 301 (3rd Cir.1961).

*Bath Iron Works Corp. v. United States,* 34 Fed.Cl. at 232–33.

The requirements laid out in Rule 1006 "recognize that the preparation of summaries from other documents carries risks of error or distortion that must be guarded against by giving the opposing party an opportunity to review and object to the underlying documents." *Conoco Inc. v. Dep't of Energy,* 99 F.3d 387, 393 (Fed.Cir.1997). Consistent with the policy of ensuring the accuracy of summaries, the United States Court of Appeals for the First Circuit has elaborated on the "made available" requirement by explaining that "a party seeking to use a summary under Rule 1006 must identify its exhibit as such, provide a list or description of the documents supporting the exhibit, and state when and where they may be reviewed." *Air Safety, Inc. v. Roman Catholic Archbishop of Boston,* 94 F.3d 1, 8 (1st Cir.1996). Thus, the admission of summaries into evidence is assigned to the discretion of the trial court. *See Martin v. Funtime, Inc.,* 963 F.2d 110, 115 (6th Cir.1992); *United States v. Winn,* 948 F.2d 145, 159 (5th Cir.1991); *Harris Market Research v. Marshall Marketing and Communications, Inc.,* 948 F.2d 1518, 1525 (10th Cir.1991); *United States v. Briscoe,* 896 F.2d 1476, 1495 (7th Cir.1990). The trial judge determines whether the preconditions for admitting summaries have been met and ensures that all parties have been treated fairly. *See Bath Iron Works v. United States,* 34 Fed.Cl. at 232 (citing *Needham v. White Laboratories, Inc.,* 639 F.2d 394, 403 (7th Cir.1981)). "Common sense dictates that this guaranteed access [to the material underlying a summary is] designed to give the opponent the ability to check the summary's accuracy and prepare for cross examination." *Air Safety, Inc. v. Roman Catholic Archbishop of Boston,* 94 F.3d at 8.

For the purposes of the summary judgment motion, defendant does not claim that the documents underlying the summaries fail to meet the sufficiently voluminous requirement or that the source documents would not have been admissible at trial. Defendant, however, does assert that the plaintiff utterly fails to establish that the originals were made available to the United States during this *de novo* proceeding, nor is it able to affirmatively establish that the documents accurately summarize the underlying documents, since the documents that the summaries are purportedly based upon no longer exist, and neither of the two witnesses which the Corporation intends to use at trial, can affirmatively testify as to

the accuracy of the summaries. [D. Brief, 4/28/00, p. 14].

Although the plaintiff has clearly identified its exhibits as summaries, it cannot produce the source documents underlying the nine summaries for the defendant to review. Plaintiff represents that it "has produced all documents available to it during discovery" and admits that "the original source time sheets, vendors' invoices, freight records, and other related source documents from which Ms. Thompson prepared her summaries were not provided to the Postal Service during discovery." Plaintiff explains that "Ran–Paige Company, Inc., [the entity that] purchased DMP out of bankruptcy and then occupied its North Carolina manufacturing and office facility, inadvertently misplaced the original source documents.[10] Those records cannot now be located, and the inability to locate them was and is in no way caused by DMP."

The fact that Doninger may not have caused the source documents to be misplaced does not bring the plaintiff closer to meeting the "made available" requirement of Rule 1006. In the course of the litigation in which the plaintiff seeks to introduce the summaries, plaintiff is obligated under Rule 1006 to provide an opportunity to the defendant to review and object to the underlying documents. The alleged misplacing of documents by Ran–Paige Company does not excuse Doninger from its litigation duty to make the source documents available to the defendant.

 When considering a claim for an equitable adjustment, a contractor must prove its costs by a preponderance of the evidence, *see Delco Electronics Corp. v. United States,* 17 Cl.Ct. at 319, using the best evidence available, even though in certain government contract cases, the best evidence may not encompass all the records required to prove actual costs, *id.* at 321. However,

the leniency allowed for proving actual costs does not permit the plaintiff to introduce any type of evidence in support of its claim or to ignore the rules of evidence designed to provide a fair opportunity to examine and test the evidence in order to ensure that the evidence admitted for the court's consideration contains a reasonable level of reliability. *See Conoco Inc. v. Dep't of Energy,* 99 F.3d at 393 ("[T]he rules recognize that the preparation of summaries from other documents carries risks of error or distortion that must be guarded against by giving the opposing party an opportunity to review and object to the underlying documents.")

 Plaintiff also argues that it has met the requirement of making the source documents available because

> [a]ll of the business records about which the Service now complains that it does not have access to were repeatedly made available to, and analyzed by, the [Postal] Service during the multi-step evolution of the Certified Claim and ultimately of the instant Complaint. Those original records were reviewed by Postal Service Auditors during at least two site visits to DMP's plant and office, and those original records became the subjects of seven[11] separate Audit Reports on DMP's claims.

Plaintiff alleges that the USPS "specifically acknowledged its receipt, review, and retention of copies of the original source documents from which Ms. Thompson's summaries were prepared." Plaintiff then cites to portions of the September 18, 1995 Inspection Service Audit Report, which state that the USPS reviewed all extrusion invoices, aluminum coil invoices, carton invoices, and diecut invoices for the entire contract period. Plaintiff also relies on statements in the September 18, 1995 Audit Report indicating that the USPS audited all

---

10. Doninger's Reorganization Plan, discussed above, recognized the importance of the source documents to any litigation brought by Doninger. The Plan provided that "[r]ecords of the Debtor shall be retained and stored by Ran–Paige Company, Inc. and shall be made available in a convenient manner to Debtor and its counsel in support of the Plan Litigation."

11. Although plaintiff claims that seven audits were completed by the government, the record contains evidence of only four audits: 1) the USPS Inspection Service audit culminating in the June 23, 1993 report; 2) the DLA Audit culminating in the August 12, 1993 report; 3) the DLA audit resulting in the August 29, 1995 report; and 4) the USPS Inspection Service audit resulting in the September 18, 1995 report.

Assembly, Fabrication and Welding labor categories for the entire contract period and reviewed "the contractor's records" related to the claim for freight costs. Although the USPS has conducted several audits of plaintiff's records since the plaintiff's first claim for equitable adjustment was submitted, and the USPS has issued written reports based on these audits, the audit reports show that not all the source documents needed to evaluate the plaintiff's claim were made available to the USPS even at the time of the audits.

The September 18, 1995 Audit Report indicates that the Inspection Service had access to certain source documents, but the Audit Report does not support the assertion that the Inspection Service had access to all the source documents required or requested to verify the amounts claimed in the summaries. Contrary to plaintiff's assertion, the ambiguous references in the Audit Report related to the Assembly, Fabrication and Welding labor categories and the "contractor's records" do not prove that all the records required and requested by the USPS were provided to the USPS auditors. In fact, upon examination of the entire Inspection Service Audit Report, the court finds repeated references by government auditors to the absence of records necessary to support the plaintiff's claim. Regarding the Material Overruns and Labor Inefficiency claims, the Audit Report provides:

Also contained within the claim for Material Quantities Overruns and Labor inefficiency were the overages and inefficiencies caused by the company's move from New York to North Carolina and subsequent training of new staff. *The contractor stated that based on his feelings and experience,* Doninger should be responsible for one half of the overruns and inefficiencies and the Postal Service responsible for the other half. *During our review we repeatedly asked for documentation to support this portion of the claim. The contractor does not maintain this type of information.* Based on the fact that *no records are available* for review of the material overruns and labor inefficiencies we have shown these amounts as unsupported expenses.

(emphasis added). Regarding the claim for freight costs, the auditor found that "the contractor could not substantiate his solicitation bid for freight costs with working papers, accounting data or pricing documents."

Next, plaintiff relies on the August 29, 1995 Audit Report issued by the DLA. This DLA Audit Report evaluated "[t]he proposed material, labor, freight, and unabsorbed overhead claim costs" requested by the plaintiff. Plaintiff argues that "the DLA also had full access to DMP's original source documents." Plaintiff further alleges that:

DLA specifically listed the types of original source documents produced for it, the documents which were obviously audited by it in order for it to express ... its ultimate conclusions in the 58 page Report. Equally telling is the note on page 2 of that Report that "[a]ny or all of these backup documents are available upon request."

The DLA's Audit Report does list the data provided by the plaintiff and examined by the DLA during its audit, and this list indicates that the DLA examined an *analysis* of direct labor costs, a *report* containing an operations *analysis* of lockboxes 2901 and 2903, a labor and material inventory *report,* invoice *summaries,* option prices *reports,* and freight costs *reports,* all of which were apparently prepared by the plaintiff. The list of data in the DLA Audit Report shows that Doninger provided DLA with reports, analyses, and in some references, summaries, but there is no evidence that the source documents underlying these reports, analyses, and summaries were made available to the DLA. The fact that the DLA's Report includes a statement that "[a]ny or all of these backup documents are available upon request" does not prove that all the source documents to the above-listed analyses, summaries, and reports were ever made available to the USPS. The ambiguous reference to "backup documents" mentioned in the DLA Audit Report may only refer to the availability of the reports, analyses, and summaries prepared by the plaintiff and offered to the government during the audit as the backup documents to the audit report, and not to the

source documents underlying these reports, analyses, and summaries.

Furthermore, the DLA's Audit Report indicates that even upon request, the plaintiff did not provide all the source documents required by the DLA to substantiate the plaintiff's claim. Regarding the materials overruns claim, the DLA Audit Report states:

> [T]he quantity and economic lot size per setup and the actual material loss per setup are required for the original and revised schedules. This information was requested from the contractor. *The contractor stated that such records do not exist for their facility.*

> The above mentioned items indicate that the contractor's proposed QUANTITY OVER RUNS for Material Claim costs *are based up on estimates of estimates....*

> The above mentioned percentage factors *are only estimates based up on judgement [sic]. The contractor did not use and/or does not have any historical information to verify how much of the $150,795 and [$]79,433 gross costs are due to the revised schedule.* Since no historical information was available to verify the proposed QUANTITY OVER RUNS for Material Claim costs, GACA recommended QUANTITY OVER RUNS for Material Claim costs are based up on analyst's plant tour, discussions with the plant manager, and the actual compared to the revised schedule shipments on EXHIBIT #1 of this TSN [Technical Support to Negotiations].

(emphasis added). The DLA also questioned the basis of other estimates provided by the plaintiff. In its claim for labor inefficiency costs, the plaintiff provided a figure for its actual productivity rate by stating that "DMP has conservatively used a productivity rate of 2.138 hrs./unit." In evaluating the plaintiff's labor inefficiencies claim, however, the DLA found that "[n]o rationale for the 2.138 rate was provided by the contractor." In addition, the Audit Report indicates that "[a]s stated by the contractor, they do not have any historical information to verify how much of the gross inefficiency costs are due to the revised schedule."

Finally, the DLA provided the following overview of its findings:

> The contractor's proposed GROSS added costs were generally determined by subtracting the reported REVISED schedule GROSS costs from the estimated ORIGINAL schedule GROSS costs. The proposed GROSS cost increases over the original schedule costs *are only estimates because they are based upon estimated original schedule costs.* To determine the proposed costs due to the revisions in the original schedule, estimated percent factors and hourly rates were applied. The proposed costs increases due to the schedule changes *are estimates of estimates and are not verifiable.* To complicate matters further, the added costs due to the move from New York to North Carolina and the paint problems needed to be segregated from the costs due to the revision in schedule. The reliability of information used by the contractor and the above mentioned added complications made the verification of the actual added costs due to the schedule revision very difficult for the contractor and the TSN analyst. This is the reason a comparatively low amount of the proposed added costs due to the schedule revision could be justified as reasonable.

(emphasis added).

During his deposition, Mr. Doninger provided testimony regarding the plaintiff's lack of records as follows:

> Q.... One of the things, let's say, that I noted when I was reading through the documentation in this case is that, when the auditors are preparing their report or they're studying the situation, there are multiple references to the fact that they requested X, Y, and Z types of documents and that Doninger Metal Products claimed that there were no such documents available; therefore, that those claims could not be substantiated based on the records that would be kept in the normal course of business as far as the auditors were concerned.

> A. Right. Well, I think they presumed that we would have formal documentation as to how many lockboxes per hour that we could manufacture based on our experi-

ences in New York and all this other stuff. And as I said *we didn't keep formal records of that kind of information.*

Q. Why didn't you keep formal records? Let me ask you within this framework.

Doninger Metal Products Corporation is a corporation that has existed since the fifties. The nature of it's [sic] business or let's say it has a history of business in government contracting that would normally be expected to require carefully kept records. Why didn't your corporation keep records like this based on over 20 years of experience in government contracting?

A. Well, I can understand why you're asking that question. The best way I can answer it is this, we were a small ma-and-pa type operation for as long as my father and mother were running the corporation.

My father did not believe in advertising which would be normal for a company such as ours, *he did not believe in having a sales force, he did not believe in spending money on what he considered to be bureaucratic recordkeeping, he kept everything in his head. His entire file cabinet was in his shirt pocket.*

He was a throwback to the old ways of doing business. And being his son, and my brother, when he was in the company, *we did a lot of those things.* He fought tooth and nail when we first insisted on getting computers.

(emphasis added).

Ms. Thompson's deposition testimony also provided information regarding Doninger's inability to produce certain documents requested by the USPS auditors:

Q. Is it correct that during those audits, the auditors were requesting documents types of documents that your company did not keep?

A. Yes.

Q. Would you explain which were they?

A. They would be specific to time and motion kinds of studies or to justify your standard. We've talked a little bit about the number of labor hours per the assembly phase or per fabrication phase or per welding or perhaps not just relating to the standards, they also wanted more detailed records in terms of how many hours does it take to make the left-hand piece of the lockbox frame, we didn't have those records.

. . . .

Q. . . . Did the auditors request historical data concerning lockbox contracts that Doninger Metal Products had performed previously for the United States Postal Service?

A. Yes, they did.

Q. And was that information provided?

A. No, it was not.

Although the plaintiff represents that the necessary source documents were provided or made available to the DLA upon request, the DLA Audit Report and the deposition testimony of plaintiff's two witnesses indicates that not all the source documents were provided with the plaintiff's summaries and reports or produced even after requests by the DLA. Thus, the September 18, 1995 and the August 29, 1995 Audit Reports, as well as the deposition testimony provided to the court, fail to support plaintiff's contention that the USPS acknowledged receipt of all the source documents to Ms. Thompson's nine summaries. In fact, the record shows that although the USPS obtained access to some records, it was not provided with all the source documents it requested, or which were necessary, in the opinion of those preparing the Audit Reports, to verify the plaintiff's entire claim for equitable adjustment because the source documents required and requested were never kept or maintained by Doninger.

Furthermore, even if all the source documents had been made available to the USPS during the audits performed prior to the filing of the present case, such production of documents during an audit is not sufficient to meet the "made available" requirement of Rule 1006 of the Federal Rules of Evidence. In *Bath Iron Works Corp. v. United States,* 34 Fed.Cl. at 233, the court found that the plaintiff, the party offering summary evidence, had the obligation to produce records supporting its summaries during the litiga-

tion in the United States Court of Federal Claims and had failed to establish that the underlying documents were made available to the defendant, the Navy. The plaintiff in *Bath Iron Works* argued that the defendant had access to the source documents while the defendant was preparing its Technical Advisory Report on the plaintiff's claim for equitable adjustment. *Id.* at 229, 233. The *Bath Iron Works* court found that although the defendant "reviewed [the plaintiff's] documents at [the plaintiff's] facilities, receiving full cooperation and access from [the plaintiff]," *id.* at 229, the plaintiff's production of the source documents "more than a year ... before this action was even filed and over five years before trial" was not sufficient to meet the plaintiff's obligation of proving that the source documents had been made available to the defendant, *id.* at 233. Thus, the court found that the summary evidence offered at trial did not meet the requirements of Rule 1006, *id.* at 234, which mandates that the documents underlying the summaries "shall be made available for examination or copying, or both, by other parties at reasonable time and place." Fed.R.Evid. 1006.

In the present case, the Audit Reports on which plaintiff relies for proving the production of the source documents were issued on August 29, 1995 and September 18, 1995. The present lawsuit was filed several years later. This alleged production of the source documents more than a year before the filing of this claim likewise fails to meet the "made available" requirement. This is especially the case because the record is replete with evidence that according to those auditing and reviewing plaintiff's claims, the plaintiff did not produce sufficient records to document its request for an equitable adjustment or even produce all records requested by the government contemporaneous to the audits and reviews.

In *Corban Industries, Inc. v. United States,* 24 Cl.Ct. 284, 288 (1991), the court granted a partial summary judgment to the defendant because of the plaintiff's lack of records to support its claims for materials costs, but denied the motion for summary judgment regarding plaintiff's claims for labor costs. The plaintiff sought damages for termination of its contract by the government. *Id.* at 285. In opposition to defendant's motion for summary judgment and in support of its claim for labor costs, plaintiff alleged that "in 1985 plaintiff delivered to the contracting officer, at the latter's request, copies of records pertaining to employee hours worked and rates of pay. 'The records were not returned, and remain in the possession of the Veterans Administration.'" *Id.* at 287. Defendant responded by arguing that "the VA [Veteran's Administration] does not have these records; rather, they were sent to the Department of Labor." *Id.* The *Corban* court found that the allegations made by both parties demonstrated a dispute of fact which precluded summary judgment on the issue of labor costs. *Id.* Significantly, the *Corban* court did not find that the previous production of the payroll records to the defendant was sufficient to meet the plaintiff's burden of proving damages. Instead, the court indicated that the plaintiff would be given an opportunity to prove its labor costs after defendant had an opportunity to return the payroll records in the VA's possession to the plaintiff. *Id.* at 288. Regarding the plaintiff's alleged materials costs, however, the court found that "[p]laintiff has not accounted for the lack of records supporting its costs for materials, nor has plaintiff put forth any factual predicate that would allow the court to make a fair and reasonable approximation of the amount of termination costs that plaintiff sustained for materials." *Id.* Thus, the court granted a partial summary judgment to the defendant on the plaintiff's claim for materials costs.

The facts of the present case do not demonstrate a disputed factual issue regarding the location of the documents necessary to prove plaintiff's claims. Defendant states that

> [t]he books and documents from which the nine documents attached to Ms. Thompson's deposition were prepared and which would allow the Court to make a determination concerning the merit of the claims made by plaintiff in this case, have not been made available to defendant through discovery .... Although we believe that all documents available to plaintiff have been produced, we have been informed that the

source documents relevant to the claims before this Court were lost at Ran–Paige Corporation.

Plaintiff likewise agrees that "the original source time sheets, vendors' invoices, freight records, and other related source documents from which Ms. Thompson prepared her summaries were not provided to the Postal Service during discovery. Further, the Postal Service's belief that DMP has produced all documents available to it during discovery is correct." Therefore, both parties agree that the source documents underlying the nine summaries have not been produced during the litigation in this court and are not available for production.

As noted above, the admissibility of summaries pursuant to Rule 1006 is committed to the discretion of the trial court. Although not raised by the plaintiff, the court considers the interplay between Rule 1006, which regulates the admissibility of summaries, and Rule 1004 of the Federal Rules of Evidence, which permits the admission of secondary evidence under certain circumstances. Rule 1004, in pertinent part, provides: "The original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if—(1) *Originals lost or destroyed*. All originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith ...." Fed. R.Evid. 1004 (emphasis in original). Rule 1004 establishes a general exception to the best evidence rule which requires the submission of original documents to prove the contents of the documents. *See* Fed.R.Evid. 1002. When underlying source documents are lost or destroyed, the exception set forth in Rule 1004 is incompatible with one of the clear requirements of Rule 1006, which mandates that "the originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place." Fed.R.Evid. 1006.

Although a limited number of federal courts have admitted summaries pursuant to Rule 1004 as the "best evidence" of underlying documents that have been lost or destroyed, these cases are distinguishable from the particular facts of the present case. In *United States v. Dudley*, 941 F.2d 260 (4th Cir.1991), *cert. denied*, 502 U.S. 1046, 112 S.Ct. 908, 116 L.Ed.2d 809 (1992), the court found that summaries of regularly kept business records which had been "destroyed pursuant to the routine policy of [the respondent] to destroy out-dated records" were admissible pursuant to Rule 1004 because the summaries represented the "best evidence" of the destroyed records. *Id.* at 264. In *Dudley*, "there had been no ground raised for contesting the accuracy or trustworthiness of the information" contained in the summary. *Id.* In the present case, however, defendant contested the accuracy of the amount submitted in the certified claim, even during the administrative review process, and contests the accuracy of the summaries offered to this court by arguing that the plaintiff cannot "affirmatively establish that the documents accurately summarize the underlying documents, since the documents that the summaries are purportedly based upon no longer exist, and neither of the two witnesses which the Corporation intends to use at trial, can affirmatively testify as to the accuracy of the summaries."

Likewise, in *White Indus., Inc. v. Cessna Aircraft Co.*, 611 F.Supp. 1049, 1071 (W.D.Mo.1985), the court admitted summaries for which "a number of the underlying aircraft files are now missing (estimated to be approximately 25% of the total included in the summary)," but for which there was "no indication that plaintiffs were responsible for the loss or destruction of the files, much less that they acted in 'bad faith' in connection therewith." In *White Industries, Inc.*, however, approximately 75% of the underlying source documents were made available to the party opposing the admission of the summaries, and upon review of the available source documents, the opposing party identified problems and ambiguities contained in the summaries, which resulted in specific excisions from the record. *Id.* at 1072–73. In the present case, none of the source documents underlying the nine summaries were produced during this litigation, and even when affording the plaintiff the benefit of all reasonable inferences, the record will only support a finding that only some of the requested source documents were produced previous to this litigation. Thus, the defen-

dant in the present case cannot even partially verify the summaries offered by the plaintiff and has no access to primary records which would assist the defendant in challenging any portion of the summaries.

Finally, in *In re Sol Bergman Estate Jewelers, Inc. (Sicherman v. Diamoncut, Inc.)*, 225 B.R. 896, 900 (6th Cir. BAP 1998), *aff'd*, 208 F.3d 215 (6th Cir.2000) (table), the court allowed the admission of exhibits pursuant to Rule 1004 which "result[ed] from the Debtor's inventory cards and computer records, which were unavailable at the time of trial." The plaintiff in *Diamoncut* was a Chapter 7 Trustee who had "instituted an adversary proceeding to avoid allegedly preferential transfers [within the 90 days preceding the Debtor's Chapter 7 petition] made by the Debtor to Diamoncut, including a series of merchandise returns." *Id.* at 899. The defendant, Diamoncut, conceded that it had received an avoidable preference from the Debtor, but disputed the amount of the transfer to Diamoncut. *Id.* Among other evidence, to prove the value of the returned merchandise, the Trustee offered exhibits for which the source documents had been "lost or destroyed in the course of a postpetition auction of the Debtor's personal property." *Id.* at 900. The *Diamoncut* court, commenting on the interplay between Rule 1006 and Rule 1004, employed general language to support the admission of the exhibits as "secondary evidence where original evidence is unavailable." *Id.* at 902. The *Diamoncut* ruling, however, is not precedential for this court, and moreover, does not resolve the particular factual circumstances presented by the above-captioned case. In *Diamoncut*, all of the source documents necessary to prove the value of the returned merchandise, apparently, were available before the postpetition auction. *Id.* at 900. Moreover, Diamoncut, the party opposing the admissibility of the summaries and a party to the merchandise return at issue, could have produced its own records showing a complete history of its revenues during the time at issue, but apparently chose to rely solely on the testimony of its president. *Id.*

■ In the present case, some of the information identified by the government au-

ditors as necessary to verify the plaintiff's claim was never maintained or recorded because according to the deposition testimony of Mr. Doninger, the contractor did not keep certain types of records. Because some of the records required to prove the plaintiff's case never existed and because the plaintiff never supplied certain information to the government when requested by the auditors, the summaries prepared by Ms. Thompson, which, according to the plaintiff, support all of the costs claimed by the plaintiff, lack even the basic indicia of reliability. Also, in the present case, the government was not a party to the transactions between Doninger and its employees and vendors, and the government was in no position to compile records of its own to rebut Doninger's claim for damages. Thus, the defendant in the present case is at a greater litigation disadvantage than the defendant in *Diamoncut*, which could have verified the plaintiff's summaries and developed a rebuttal case using its own records of the illegal transfers at issue.

The explicit language of Rule 1006 requires that the documents underlying a proffered summary be "made available" to the opposing party, and the unavailability of these source documents severely limits the defendant's ability to verify the accuracy of the summaries and to prepare a defense, including preparing for cross-examination. As discussed above, the alleged production of only some of the source documents during the government's previous audits will not satisfy the "made available" requirement in Rule 1006. Thus, this court finds that given the facts of the case brought by the plaintiff Doninger, despite the loss of the backup documents for the nine summaries offered by the plaintiff, although allegedly through no fault of the plaintiff, the nine summaries on which the plaintiff relies should not be admissible at trial and do not provide a sufficient basis for the plaintiff to rebut the defendant's summary judgment motion.

In response to defendant's motion for summary judgment and in addition to the nine summaries, plaintiff offers only two available witnesses in this case, Mr. Michael B. Doninger, former president of the Corporation, and Jackie Thompson, the Corporation's for-

mer controller, through the introduction of their deposition testimony, the two certified claims submitted to the contracting officer, and the responses to defendant's interrogatories. Plaintiff first represents that Mr. Doninger had extensive involvement in the preparation of the May 3, 1995 certified claim for unabsorbed overhead delay damages, the May 31, 1995 certified claim for all other damages claimed, and the complaint filed in this court. As noted above, Mr. Doninger's involvement in the preparation of the tables attached to the certified claim and the complaint showing the amounts claimed consists only of "broadbrush logic and reasoning" based on his experience because the only hard data relied upon by Mr. Doninger was the nine summaries prepared by Ms. Thompson.

Plaintiff further argues that Mr. Doninger's testimony should be considered expert testimony, although no convincing basis to qualify him as an expert witness under Federal Rule of Evidence 702 has been offered by the plaintiff, and as the President of the plaintiff company and certifier of the claim, he appears more suitable as a fact witness. In addition to Mr. Doninger's deposition testimony, plaintiff claims that Mr. Doninger's expected testimony at trial regarding its Count III materials overrun claim and its Count IV labor inefficiency claim "was set forth in detail in response to Interrogatory Nos. 13, 14, and 15" and was "fully and clearly articulated" in Doninger's May 31, 1995 Certified Claim. Upon review of Doninger's responses to the defendant's interrogatories and the information provided in the May 31, 1995 certified claim, the court finds that the plaintiff expects to offer Mr. Doninger's testimony regarding the general theory behind how material overruns and labor inefficiency can result from a delayed delivery schedule. In terms of providing testimony regarding actual costs, however, the responses to the interrogatories and the certified claim proffered by the plaintiff show that the costs claimed by the plaintiff are based on the summary tables attached to the certified claim. According to the plaintiff, the summary tables attached to the certified claim and to the complaint are all supported by "the nine documents prepared by Ms.

Thompson," which this court has held inadmissible.

Without the source documents underlying Ms. Thompson's summaries, Mr. Doninger's expected testimony in any witness capacity, however, will consist of estimates based only upon his experience without any contemporaneous records, and mere estimates from a witness, even if he could be qualified as an expert, still would not suffice to meet the plaintiff's burden of proof. *See In re TMI Litigation,* 193 F.3d 613, 705 (3rd Cir.1999) (affirming trial court's exclusion of expert testimony based on summary sheets for which it was "impossible to assess their reliability" because the plaintiffs had failed to demonstrate "how the sheets were prepared and the sources of the information contained in them"); *Appeal of Assurance Co.,* 86–1 B.C.A. (CCH) ¶ 18,737, 94,279, 1986 WL 19637 (A.S.B.C.A.1986) (finding that the contractor was not entitled to an equitable adjustment above the amount awarded by the contracting officer where the record contained no evidence of the contractor's books or records and the estimates could not be relied upon because the Board could not determine "how the estimates were formed or when the estimates were made"); *Appeal of Leopold Constr. Co., Inc.,* 81–2 B.C.A. (CCH) ¶ 15,277, 75,647, 1981 WL 40513 (A.S.B.C.A.1981) (finding that "estimates are particularly vulnerable if they lack specific material concerning performance or are not supported by corroborating data").

The other witness offered by the plaintiff to prove its claim is Ms. Jackie Thompson, the former controller for the Corporation. Plaintiff represents that "Ms. Thompson's testimony will concern the process she followed during the preparation of the nine [summary] documents which are the Exhibits to her deposition transcript and what the entries on those nine documents mean." The deposition transcript indicates that Ms. Thompson was specifically questioned about the amount of damages incurred as a direct result of the government's changed specifications. As discussed above, Ms. Thompson appears to be unable to verify that the amounts claimed in the five counts of the plaintiff's complaint represent the actual

damages caused by the changed requirements imposed by the government. Because Ms. Thompson cannot affirmatively testify to the amount of damages incurred by Doninger as a result of the change in the delivery schedule imposed by the government and states that she is not familiar with the specific calculations used to support the plaintiff's claim, Ms. Thompson's testimony does not provide evidence of liability or causation sufficient to meet plaintiff's burden of proof on any of the counts alleged by the plaintiff.

Upon review of the full record available to the court, the court finds that all the evidence the plaintiff has offered is ultimately based on the nine summaries prepared by Ms. Thompson. Plaintiff states that "[t]hose summaries, which detail DMP's historical costs during the performance of this Contract, are the foundation of the claims and it is from them that all analyses of those claims must proceed." Even when affording plaintiff's representations the benefit of all reasonable inferences, the record reveals that Ms. Thompson prepared summaries of only a limited number of source documents because some of the source documents the government auditors believed were necessary to substantiate the plaintiff's claim were never kept or maintained by the contractor. Moreover, the figures presented in the nine summaries, according to Ms. Thompson, did not segregate the costs caused by the government change and do not directly translate into the amounts claimed in the complaint. Even Ms. Thompson could not testify to the rationale or method used to develop the amounts in the complaint after examining her own summaries. Mr. Doninger apparently provided input based on Ms. Thompson's summaries, which resulted in the amounts claimed in the complaint, but he describes his input merely as "broadbrush logic and reasoning" based on his experience. Without the source documents to support any of the nine summaries, the plaintiff cannot prove that it has incurred costs that have not been paid by the government because the plaintiff cannot prove the actual costs it incurred, much less the additional costs specifically caused by the government's revision of the contract.

Although courts have employed alternative methods of awarding damages under appropriate circumstances in which actual costs could not be proven, the total cost method and the jury verdict method are not favored, and the plaintiff in this case does not meet the requirements for applying any of the alternative methods. *See Servidone Constr. Corp. v. United States*, 931 F.2d at 861 (total cost method); *Dawco Constr., Inc. v. United States*, 930 F.2d at 880 (jury verdict method). Without source documents, the evidence proposed by the plaintiff cannot be verified to a sufficient degree of reliability even to prove a total costs claim. Furthermore, the jury verdict method is only permitted when liability is clear. *See Dawco Constr., Inc. v. United States*, 930 F.2d at 880. In the present case, the plaintiff cannot prove that the government is liable for an equitable adjustment greater than the amount awarded by the contracting officer. The contracting officer awarded Doninger $104,372.00 after reviewing the limited records in Doninger's possession at the time of the USPS audits. At the present time, Doninger admits that it does not possess even the records made available to the USPS during the audits because Ran–Paige Corporation has allegedly misplaced all of Doninger's source documents. Thus, a liability finding in this court would have to be based on even less primary documentary evidence than was available to the government auditors and the contracting officer. Furthermore, even the plaintiff does not claim that it meets the requirements for employing an alternative method for calculating damages, and instead asserts that its claims are based on an apparent actual cost method.

The evidence presented by the plaintiff does not fulfill its burden of establishing the presence of a disputed material fact, thus rendering a trial futile because "more evidence than is already available in connection with this motion could not be reasonably expected to change the result herein." *Pure Gold, Inc. v. Syntex, Inc.*, 739 F.2d 624, 626 (Fed.Cir.1984). Summary judgment is properly regarded as a tool designed " 'to secure the just, speedy and inexpensive determination of every action.' " *Celotex Corp. v. Catrett*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting

Fed.R.Civ.Proc. 1). In cases such as this one, in which there is no indication that additional testimony or documentation would be available to the plaintiff at a trial and in which the record before the court could not lead a rational trier of fact to find for the nonmoving party, award of summary judgment to the defendant at this time is appropriate.

### CONCLUSION

For the foregoing reasons, defendant's motion to dismiss and defendant's motion for summary judgment are, hereby, **GRANTED**.

**IT IS SO ORDERED.**